NAPPANEE MILLING CO. *v.* THE SIMPSON GRAIN CO.

[No. 871A160.  Filed April 25, 1972.]

*Yoder, Ainlay, Ulmer & Buckingham,* of Goshen, for appellant.

*Lewis C. Laderer, Jr., Schindler, Kramer & Rowe,* of South Bend, for appellee.

STATON, J.—The Simpson Grain Company sold chicken feed to one of its customers, and his chickens died. The chicken feed contained a copper sulphate additive which had been furnished to The Simpson Grain Company by Nappanee Milling Company. The Simpson Grain Company filed an action for indemnity against Nappanee Milling Company. A court trial resulted in a judgment for The Simpson Grain Company in the sum of $1,863.63. Nappanee Milling Company is appealing from this judgment. We affirm the trial court judgment in the opinion that follows:

Vurl Brubaker, a chicken farmer, exhibited a plastic bag of copper sulphate powder to Max Fusselman, who was an employee of The Simpson Grain Company, and told him that he needed a fifty pound bag of this substance to mix with his next order of chicken feed. Mr. Brubaker explained that his veterinarian had advised him to continue mixing the fine copper sulphate powder in his chicken feed. This mixture reduces mold in the digestive tract of the chickens. The small plastic bag was shown to Paul Gagle, a salesman for Nappanee Milling Company, and an order for a fifty pound bag of copper sulphate was given to him. It was explained to the salesman that the copper sulphate was to be used in chicken feed.

When the fifty pound bag of copper sulphate arrived from the Nappanee Milling Company, the word "crystals" appeared on the side of the bag. Max Fusselman had been a milling man for fifteen years and knew that poultry had a propensity

to eat larger objects in their feed, but he had never before used copper sulphate in chicken feed. Feeling somewhat apprehensive about the coarse appearance of the copper sulphate, he requested that the truck driver return the bag to the Nappanee Milling Company. The truck driver would not accept the responsibility of taking the bag of copper sulphate back without prior authorization from the Nappanee Milling Company. The policy of Nappanee was that a driver should not return any product at the time of delivery except broken bags. A bag which the customer desired to return was to be left by the driver until the salesman came around and prepared a pick-up order. Max Fusselman made a telephone call to the Nappanee Milling Company and talked with a Charles Y. Roberts. Mr. Roberts was a nutritionist with a Masters Degree from Iowa State University in animal nutrition and had worked continuously in the field of animal husbandry and animal nutrition since 1953. Max Fusselman testified that he was advised not to grind the copper sulphate crystals. He testified:

"Q. Did you ask him whether or not you should grind the crystal form you had?

"A. Yes, I told him I thought it was too coarse for poultry feed and asked him if I should grind it.

"Q. And what was his response to that?

"A. He said no, I wouldn't need to, that it would dissolve in the feed.

"Q. You told him you were going to take this product and mix it with the chicken feed?

"A. Yes."

The chicken feed was mixed with the copper sulphate crystals and delivered to Vurl Brubaker who fed it to his chickens. Many of the chickens died from copper toxicity.

The Simpson Grain Company filed its complaint for indemnity against the Nappanee Milling Company, who filed an answer setting up the affirmative defense that The Simpson

Grain Company assumed and incurred the risk of loss. The parties entered into the following stipulation:

> "For the purposes of trial, the following facts are stipulated and agreed to by the parties: One—that approximately 406 laying hens owned by Jack Snowden, Virgil Amstutz and Vurl Brubaker were destroyed as the result of eating excessive quanties of copper sulphate crystals which had been added to chicken feed by the plaintiff, Simpson Grain Company.
>
> "Two—that as a result of the death of said laying hens the plaintiff, Simpson Grain Company, was obligated to compensate the bird owners for their loss, and as a result has incurred damages in the sum of $1,863.63."

The court trial resulted in a judgment for The Simpson Grain Company in the sum of $1,863.63. Nappanee Milling Company makes this appeal and urges two errors:

1. The judgment of the trial court is not supported by sufficient evidence.
2. The judgment is contrary to law since the evidence shows that as a matter of law, The Simpson Grain Company was guilty of concurrent negligence.

A comprehensive statement of the applicable Indiana law is set forth in *McClish* v. *Niagara Machine & Tool Works* (S. D. Ind. 1967), 266 F. Supp. 987. In *McClish, supra,* 266 F. Supp. at 989-991, the court stated:

> "The right to indemnity and the corresponding obligation to indemnify generally spring from contract, express or implied, and in the absence of an express or implied contract a right to indemnity generally does not exist. When indemnity is the subject of an express contract, Indiana takes the broad view that parties may lawfully bind themselves to indemnify against future acts of negligence, whether the negligence indemnified against be that of the indemnitor or his agents or that of the indemnitee or his agents. In the absence of express contract, however, Indiana follows the general rule that there can be no contribution or indemnity as between joint tort-feasors. There are, however, well recognized exceptions to such general rule wherein the right to indemnity is implied, . . .

\* \* \*

". . . as between the supplier of a defective product which does harm to an ultimate purchaser or user and the merchant who stocks and sells it as received, the merchant is entitled to indemnity from the supplier. The merchant is liable to the user for breach of his implied warranty of merchantability, and the supplier is liable to the merchant for breach of precisely the same warranty running to the merchant. But again, the right of indemnity is destroyed if the merchant knew, or should have known of the defect before reselling the product. . . .

\* \* \*

"So it may be seen that concurrent negligence on the part of one claiming the right to indemnity takes the case out of the exception, and prohibits indemnity. . . .

\* \* \*

"Where the negligent acts of parties concur in producing an injury, they are jointly and severally liable not only where there is a breach of a common duty owing by them, but also where their acts of negligence are separate and independent. In either situation they would be joint tort-feasors, in pari delicto, and no right to indemnity would exist. But if the negligence of a defendant does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent independent act of a third person, such acts are not concurrent, and the existence of the condition is not the proximate cause of the injury."

It is Nappanee Milling Company's contention that the undisputed testimony most favorable to The Simpson Grain Company shows:

1. That the copper sulphate was received in crystal or granular form.
2. That Max Fusselman knew that the copper sulphate should not be fed to chickens unless it was dissolved or reduced in size since chickens have a propensity to eat larger objects in their feed.
3. That after mixing the copper sulphate crystals with the chicken feed, Max Fusselman observed that the copper sulphate crystals had not reduced their size or dissolved.

4. That The Simpson Grain Company delivered the chicken feed to their customer with this knowledge which resulted in the death of the chickens.

Nappanee Milling Company concludes in its Reply Brief that:

"The issue before this Court is simply whether these undisputed facts which represent the evidence most favorable to Appellee constitute negligence on the part of Appellee. As these facts are undisputed, and as they represent the evidence most favorable to Appellee, this Court is in as good a position as the trial court to determine whether these acts constitute negligence as a matter of law on the part of Appellee."

If the evidence underscored by Nappanee Milling Company above stood alone and without conflict, this contention would have some merit. However, Max Fusselman had never used copper sulphate in chicken feed before, and called Nappanee's nutritionist, Charles Y. Roberts, who without inspecting the copper sulphate personally advised Max Fusselman by telephone that the copper sulphate would reduce itself in size or dissolve when mixed with the chicken feed. Max Fusselman's testimony on cross-examination was:

"Q. Didn't you observe or look at the grinding of the feed and mixing of the copper sulphate? Didn't you look at the finished product?

"A. When I dumped it in I looked at it, but he said it would dissolve and I figured it would take so long for it to dissolve."

Max Fusselman testified on direct examination:

"Q. Did you mix it with the chicken feed?

"A. Yes, I mixed it as I had been directed.

"Q. How did you mix it? What proportions?

"A. It was mixed around two pounds to a ton.

"Q. And did you ultimately deliver this to the Brubaker farm?

"A. Yes, the same day."

Max Fusselman further testified on cross-examination:

"Q. Do you know what the purpose of adding copper sulphate to the feed was?

"A. No, at that time I didn't. I was just following the directions of this farmer."

Again on redirect examination, Max Fusselman testified:

"Q. Just a couple of questions. I think the point here we are trying to reach is that at the time the copper sulphate was delivered you were just under instructions by these farmers to acquire some and use it. Is that not correct?

"A. That is right.

"Q. And you had no prior experience with it?

"A. No.

"Q. And you were relying upon Mr. Roberts' advice regarding its use, and that is the reason you went ahead when you even had questions in your own mind?

"A. Yes."

This testimony as well as other testimony found in the record justifies the inference that Max Fusselman was relying on Mr. Roberts' assurances that the copper sulphate would dissolve in the feed to an acceptable size before being used by Mr. Brubaker. We hold that there was sufficient evidence to sustain the trial court's determination and judgment for The Simpson Grain Company.

Nappanee Milling Company further contends that The Simpson Grain Company is guilty of concurrent negligence as a matter of law. This court is not in the same position as the trier of fact to determine such an issue. We are bound by strict rules. We stated in *Stallings* v. *Dick* (1965), 139 Ind. App. 118, 125, 210 N. E. 2d 82, 86:

"The Supreme and Appellate Courts have many times recognized the test for 'negligence as a matter of law' to be that negligence which is so clear and palpable that no verdict could make it otherwise. *Town of Albion* v. *Hetrick* (1883), 90 Ind. 545, 547; *New York, etc.*,

R. Co. v. *Hamlin* (1908), 170 Ind. 20, 39, 83 N. E. 343; *Town of New Castle* v. *Grubbs* (1908), 171 Ind. 482, 496, 86 N. E. 757; *Jenney Electric Mfg. Co.* v. *Flannery, supra.* "In applying this test both the Supreme and Appellate Courts have adopted the rule that the voluntary conduct of one exposing himself to dangers which are so obvious, imminent and glaring that no reasonable man exercising due care for his safety would have hazarded them in negligence as a matter of law. *Chicago, etc. R. Co.* v. *Gallion* (1907), 39 Ind. App. 604, 80 N. E. 547; *New York, etc. R. Co.* v. *Hamlin, supra; The Brazil Block Coal Company* v. *Hoodlet* (1891), 129 Ind. 327, 27 N. E. 741."

"The inquiry becomes: Under the facts and circumstances presented by the case, did the defendant in question act as a 'reasonable man'?" *Coleman* v. *DeMoss* (1969), 144 Ind. App. 408, 424, 246 N. E. 2d 483, 491. The evidence urged by Nappanee Milling Company cannot be taken alone. When this evidence is placed in the light of other evidence which is uncontradicted and shows:

1. That Max Fusselman had no prior knowledge or experience with copper sulphate and did not know what it was used for in poultry feed.
2. That Max Fusselman received a shipment of copper sulphate from a reputable milling company, but he questioned the shipment because it was different from what he had been shown by a customer.
3. That Max Fusselman immediately telephoned Mr. Charles Roberts, a nutritionist for the Nappanee Milling Company, and made inquiry as to what he should do and described the copper sulfate.
4. That Max Fusselman was assured by Charles Roberts that he had the proper substance and that it was in a coarse form that would dissolve when it came into contact with the moisture in the chicken feed.

There was some conflict in the testimony regarding the telephone conversation between Max Fusselman and Charles Roberts. The trial court determined from the evidence that there was no concurrent negligence on the part of The Simpson Grain Company. As the trier of fact, the trial court determined that Max Fusselman acted reason-

ably under the circumstances. These determinations made by the trial court are not against all the evidence nor is there a total lack of evidence to sustain these determinations. We cannot say as a matter of law that the trial court committed reversible error.

The judgment of the trial court should be and the same hereby is affirmed.

Hoffman, C.J. and Sharp, J., concur.

NOTE.—Reported in 281 N. E. 2d 514.