STATE OF INDIANA, INDIANA STATE HIGHWAY COMMISSION *v.*
RICHARD THOMAS, RUSSELL F. DAVIS, INC. AND
McMAHAN CONSTRUCTION COMPANY AND
PUBLIC SERVICE COMPANY OF INDIANA.

[No. 2-174A21. Filed April 20, 1976. Rehearing denied May 17, 1976. Transfer denied September 15, 1976.]

*Theodore L. Sendak,* Attorney General, *Robert E. Dwyer,* Deputy Attorney General, for appellant

*Floyd F. Cook, Cook and Cook,* of Kokomo, *Theodore L. Smith,* of Lafayette for appellee Thomas; *Geoffrey Segar, Ice Miller Donadio & Ryan,* of Indianapolis, *Shultz, Ewan & Burns* of Lafayette for appellees Russell F. Davis, Inc. and McMahan Construction Company; *Russell H. Hart, Stuart, Branigin, Ricks & Schilling* of Lafayette, for appellee Public Service Company.

SULLIVAN, J.—This case arises out of a highway construction accident on July 17, 1968 in which plaintiff Richard Thomas suffered personal injuries while employed by Third-Party Defendant Russell F. Davis, Inc. (Davis) in the widen-

ing and relocating of the U. S. 52 By-Pass near Lafayette. The construction work in which Thomas was involved was undertaken by Davis and its joint venturer, Third-Party Defendant McMahan Construction Company (McMahan), per their contract (designated R-7635) with Defendant/ Third-Party Defendant/Third-Party Plaintiff State of Indiana, State Highway Commission (State). Thomas' injuries resulted when the boom of a crane, the bucket of which he was touching, came in contact with energized overhead power lines owned and maintained by Defendant/Third-Party Plaintiff Public Service Co. of Indiana (PSCI).

Initially, Thomas sued PSCI for negligence in maintaining its power lines above the work site. PSCI filed third-party complaints against the State, Davis and McMahan, seeking indemnity on various theories. The State filed third-party complaints against Davis and McMahan, seeking indemnity pursuant to terms of the construction contract, #R-7635. This action, pending in the Tippecanoe Circuit Court as Cause No. C-427-68, was, by stipulation of the parties on December 20, 1972, consolidated with an action then pending in the Marion County Superior Court as Cause No. S570-6. In the latter action, plaintiff Thomas was seeking recompense for his injuries directly from the State, alleging the State's negilgence in its supervision of the construction in which Thomas was engaged. In No. S570-6, the State had filed third-party complaints against Davis and McMahan for indemnification, based upon their contract with the State.

By stipulation of the parties, plaintiff Thomas' actions in negligence against PSCI and the State were tried to a jury in the Tippecanoe Circuit Court. Also by stipulation of the parties, it was agreed that "all Third and Fourth-Party indemnity actions shall be tried to the Court. . . ." By the court's Pre-Trial Order, the contested issues of fact were stated to be, *inter alia,* (1) the negligence, if any, of PSCI as a proximate cause of the accident; (2) the negligence, if any, of the State as a proximate cause of the accident; and

(3) whether the State is entitled to indemnity from Davis and McMahan.

The negligence questions (as well as Plaintiff's damages, contributory negligence, and assumption and incurrence of risk) were submitted to the jury, the verdict being as follows:

> "We, the jury, find for the plaintiff, Richard Thomas, and against the defendant, State of Indiana, and Indiana State Highway Commission, and assess plaintiff's damages in the sum of *Two Hundred and Thirty-Five Thousand* Dollars ($235,000.00), and in favor of the Defendant Public Service Company of Indiana."

The trial court, pursuant to the parties' earlier stipulation, then considered the question of whether the State was entitled to indemnification from Davis and McMahan. The court concluded that the State was not entitled to indemnity and entered judgment for Thomas against the State for $235,000, the amount found by the jury. The State appeals, asserting that (1) it ought not be held liable to Thomas, either because the State's employees were not negligent at all, or because the asserted negligence of Davis was *the sole* proximate cause of plaintiff's injuries, and (2) even if properly found liable to Thomas, the State is nonetheless entitled to indemnification from Davis and McMahan.

The facts most favorable to the appellees reveal that when the accident occurred, the Davis Construction Co. crew of which Thomas was a member was engaged in constructing a manhole on the sewer line which ran beside the U.S. 52 By-Pass, near the Anheiser-Busch plant. On top of the sewer pipe, a wooden form had been built into which concrete was to be poured. The form and sewer line beneath it were located in an excavation some ten or twelve feet deep. Some thirty feet above ground level and nearly directly over the excavation were the energized power lines of PSCI. A crane with a boom of some fifty to sixty feet, operated by its owner under contract with Davis, sat on the edge of the excavation and was to pour the concrete. The crane was equipped with a steel

bucket with which it would scoop up the concrete from a tray supplied by a nearby truck. The crane would then swing its boom over the hole, and lower the bucket to Thomas and two other Davis employees waiting below who would guide the bucket over the form to release the concrete. It was just as Thomas and his co-workers were placing their hands on the bucket that the crane's boom touched the overhead power lines.

The parties do not dispute that performance of the concrete-pouring operation in the manner described above violated certain safety regulations prescribed by the Indiana State Department of Labor and the United States Department of Commerce made applicable to this project by the express terms of the State's contract with Davis and McMahan. Typical of the applicable safety regulations are the sections of Safety Code No. 13, promulgated by the State Department of Labor for the Construction Industry:

> "12-21.   Power *shall* be cut off from electric lines within range of shovel or crane operation whenever possible. When not possible to cut off power the shovel or crane *shall not* be operated within electrical reach of electric transmission lines.
> 12-22.   A man shall be posted to warn shovel or crane operator of close proximity of electric wires or other wire or guy lines when operating or moving machines." (Emphasis supplied)

Ample testimony buttressed the obvious inference that the operation of a crane with a fifty to sixty foot boom directly beneath live power lines only thirty feet above the ground was, in the words of a Civil Engineer employed by the State, "highly dangerous."

The State's contract with Davis and McMahan required that "[i]n the performances of this contract, the contractor shall comply with applicable Federal, State and local laws governing safety, health and sanitation." However, the evidence is clear that the State was not content to rest upon Davis' contractual assurances, but rather took an active hand in super-

vising the construction to insure that the work was properly and safely performed. To this end the State employed a Project Engineer who, with the assistance of several Inspectors, worked with Davis and McMahan on a daily basis at the job site to insure that the contractors complied with all of the specifications of the contract, including those terms requiring observance of applicable safety regulations.[1] As stated by an engineer of the State Highway Commission employed as the Project Engineer's immediate superior:

> "Well, at that time [July, 1968] and still, I think, the general feeling is on a project that it's both the responsibility of the Project Engineer and the contractor's personnel to see that all safety regulations are complied with. If the Project Engineer observes the—the noncompliance of safety regulations, it's his responsibility to inform the contractor's supervisory people that they—they—they are taking chances in violating the specifications."

1. Specification A501 of the contract states, *inter alia*, that:
   "A501. AUTHORITY OF ENGINEER. All work shall be done under the direct supervision of the Engineer. In order to prevent litigation and misunderstanding, and so that the work may be expedited and fulfill all requirements of the proposal, the Engineer shall:
   1. Decide and determine mutual rights between Contractors;
   2. Decide any and all questions which may arise as to the quality and acceptability of materials furnished and work performed;
   3. Decide as to the manner of performance and the rate of progress of the work;
   4. Decide all questions which may arise as to the interpretation of the specifications and plans relating to the work;
   5. Decide all questions as to the acceptable fulfillment of the contract on the part of the Contractor;
   6. Determine the amount and quality of the several kinds of work performed and materials furnished which are to be paid for under the contract;
   7. Exercise such other authority as given under these specifications."

   Specification A507 states in part that:
   "A507. AUTHORITY AND DUTIES OF INSPECTORS. The Inspectors employed by the State are stationed on the work to:
   1. Keep the Engineer informed as to the progress of the work and the manner in which it is being done;
   2. Report whenever it appears that the materials furnished and the work performed by the Contractor fail to fulfill the requirements of the specifications and contract;
   3. Call to the attention of the Contractor any deviation from, or infringement upon the plans and specifications."

The record reveals that the authority of the Project Engineer and the Inspectors to make certain that the work was safely performed was considerably broader than a mere ability to warn or notify the contractor of an unsafe condition or practice. Explicit specifications of the contract authorized the Project Engineer and the Inspectors (the latter subject to the Engineer's approval) to temporarily suspend the work and/or modify the manner of performance contemplated by the contractor.[2]

---

2. Contract Specification A802, entitled "Prosecution of Work," states in part that:

"The work shall begin at such points as the Engineer may direct and shall be prosecuted diligently at such rate and with such materials, equipment, labor and supervision as is considered necessary to insure its completion within the time set forth in the proposal and contract. "Unless otherwise instructed by the Engineer, each operation shall be started as soon after the contract is awarded as conditions will permit. Each class of work will be expected to progress from the date it is begun until completed. When so ordered by the Engineer, the Contractor shall immediately provide such additional equipment, supplies and labor as may be necessary to complete the work within the time specified in the contract."

Specification A803 provides in part that:

"A803. LIMITATIONS OF OPERATIONS. When the Contractor has obstructed or closed a greater portion of the work than is necessary for proper prosecution, or is carrying on operations to the prejudice of work already started, the Engineer may require the Contractor to finish that portion on which work is in progress before any additional portions are started. Work shall be conducted with minimum inconvenience to traffic."

Specification A804 requires that, *inter alia:*

"A804. CHARACTER OF WORKMEN AND EQUIPMENT. The Contractor shall employ such superintendents, foremen and equipment as are careful and competent. The Engineer may demand the dismissal of any person employed by the Contractor on the project who shall misconduct himself or be incompetent or negligent in the performance of his duties, or who shall neglect or refuse to comply with the directions given, and such person shall not be employed again thereon without written consent of the Engineer.

The methods, appliances, machinery and equipment used, and the labor employed, shall be such as to produce a satisfactory quality of work and shall be adequate to complete the work within the time specified in the contract."

Specification A805 reads, in part:

"A805. TEMPORARY SUSPENSION OF WORK. The work may be suspended by the Engineer, wholly or in part, for such period or periods as may be necessary on account of:

1. Unsuitable weather conditions;

2. Failure on the part of the Contractor to carry out instructions given, or failure to perform any or all provisions of the contract;

The record contains reference to several instances in which either the Project Engineer, Mr. Shen, or a State Inspector exercised his authority to control the manner of Davis' performance under the contract. For example, on one occasion a State Inspector, Joseph McIntyre, had prevailed upon Davis employees to stop working in an area which McIntyre thought was dangerous to the workers and to the public because of heavy traffic. Immediately prior to the accident here involved, Engineer Shen inspected the excavation into which Thomas was to help pour the concrete and ordered Davis employees to widen the hole so that it would be safer for the workers. After the accident, it was Shen who ordered concrete-pouring operations at that site suspended for the day, and completed the operation on the following day with the use of ground-level chutes rather than a crane.

De-energization, insulation or relocation of the overhead power lines could only be accomplished by PSCI as owner of those lines. Shen's authority as Project Engineer to induce PSCI to take measures with respect to relocating or de-energizing the lines was unquestioned, and in fact was first exercised at a "head-knocking" pre-construction utilities conference in May of 1968. Shen admitted that he had the authority to require PSCI to relocate or de-energize its lines and thus "by-pass" the area in which the lines passed over the excavation. In fact Shen had been successful in doing just that on other occasions when the proximity of PSCI's live wires had posed a threat to safety. Testimony indicated that Davis employees could ask Shen to get PSCI to move, insulate

---

3. Any other conditions which, in the judgment of the Engineer, make work impractical."

Specification A507, respecting "Authority and Duties of Inspectors" includes this paragraph:

"Inspectors shall be authorized to inspect all work done and materials furnished, and to exercise such additional authority as may be delegated to them in writing by the Engineer. Such inspection may extend to all or any part of the work done and material furnished. They shall have authority to reject defective materials and to suspend any work that is being improperly done, subject to the final decision of the Engineer."

or de-energize its wires, but that PSCI did not customarily deal directly with Davis and would take action with respect to its lines only when so directed by the State.

Prior to the accident both Project Engineer Shen and State Inspector McIntyre were aware that Davis intended to use a crane with a fifty foot boom to pour the concrete. Shen had inspected the excavation shortly before the pouring operation began and had seen the crane on the edge of the hole beneath what he knew were live wires. Inspector McIntyre was an eyewitness to the accident. The evidence most favorable to the verdict indicates that neither Shen nor McIntyre took any action to prevent the operation from proceeding as planned or to have the overhead lines de-energized, insulated or relocated, despite ample opportunity and unquestioned authority to do so.

## ISSUE OF STATE'S NEGLIGENCE NOT PRESERVED FOR APPEAL

The State contends that the trial court erred in finding that "[t]he negligence of the State of Indiana, Indiana State Highway Commission was a proximate cause of the injuries received by the Plaintiff, Richard Thomas". The State's argument is that the undisputed negligence of Davis employees was *the sole* proximate cause of Thomas' misfortune. Whatever the merits of this argument, we have little choice but to decline to reach the merits of the issue because the State failed to present the alleged error to the trial court in its Motion to Correct Errors. Ind. Rules of Procedure, Trial Rule 59 (G).

As we have noted, the parties stipulated that the questions of the alleged negligence of the State's own officers, agents and employees, and the State's liability therefor, were to be tried to the jury. The jury was instructed that it could return a verdict against the State only if *the State's own employees* were negligent and that such negligence proximately caused the injuries suffered by plaintiff. No instructions were given

to the effect that the State could be liable to Thomas without its own agents or employees having been negligent, e.g., as being somehow responsible for the negligent acts of Davis' employees. The legal meaning which must be ascribed to the verdict is that *the jury* was convinced that employees of the State, for whose tortious conduct the State was responsible under the principle of respondeat superior, were negligent in such manner as to have proximately caused Thomas' injuries. Nowhere in its motion to correct errors does the State claim that the jury verdict was erroneous.

Nor does the State's motion to correct errors contain any specification to the effect that the trial court erred in granting judgment for Thomas on the verdict. Most of the specifications in the State's "Consolidated Motion to Correct Errors and Amend the Findings, Conclusions and Judgment" relate to the indemnification issue or various rulings of the court with respect to the evidence and certain motions by the State.[3] Even those allegations in the State's motion which do pertain to the question of negligence do not claim error in the court's "finding" that the State's negligence proximately caused Thomas' injuries. The State merely asserted that the court's findings ignored evidence of Davis' negligence and were therefore "inadequate", and that the finding acknowledging the jury verdict was "not germane" to the indemnity issue.

In view of the parties' stipulation that all questions of negligence were to be resolved by the jury, and since the jury was instructed that the State could only be found liable if its own employees were negligent, it is readily apparent that the trial court's "conclusion of law" that the State's negligence was a proximate cause of Thomas' injuries merely reiterated the legal significance of the jury verdict. Thus, any error in the resolution of the issue of the

---

3. These latter claims of error must be deemed "waived" because of the State's failure to argue them herein. AP. 8.3 (A).

State's liability for its agents' negligence would lie in the jury's verdict, not the trial court's "conclusion." Not only did the State fail to allege error in the jury's disposition of the negligence issue, but similarly failed to claim that in this respect the trial court's "conclusion" was erroneous. Since the State failed totally to claim error in the resolution of the negligence question within 60 days of the judgment, we must refuse to recognize such claim now.

## DENIAL OF INDEMNIFICATION FOR STATE'S OWN NEGLIGENCE NOT ERROR

The State asserts that it is entitled to indemnification from Davis and McMahan notwithstanding any negligence on the part of its employees for which the State is responsible. In part, the State's argument rests upon the parties' contract. However, the State also contends that it should recover from the contractors based upon a theory of implied indemnity which obtains when the indemnitee is only "passively" or "secondarily" negligent while the indemnitor is "actively negligent".

Davis and McMahan respond that the contract is not sufficiently clear and unambiguous to permit a construction entitling the State to indemnification for its own employees' negligence. Appellees also assert that the fact of the State's own negligence and liability therefor to Thomas precludes indemnification unless based upon a contract.

Much of the State's argument with respect to the indemnity issue is based upon its assumption that Davis was negligent and that such negligence proximately caused Thomas' injuries. The State theorizes that its own negligence is immaterial since specification A711 of the contract requires Davis and McMahan to indemnify the State for losses resulting from their negligence, and that Davis was clearly negligent in this case. Even assuming the fact of Davis' negligence and that such negligent conduct was a proximate cause of Thomas' injury, such would not obviate the State's negli-

gence but would merely make the State and Davis joint tort-feasors whose negligence concurred in producing the injury. In such case the two could be held jointly and severally liable. *See Nappanee Milling Co.* v. *Simpson Grain Co.* (1972), 152 Ind. App. 1, 5, 281 N.E.2d 514, 517; *McLish* v. *Niagra Machine & Tool Works* (S.D. Ind. 1967), 266 F.Supp. 987 991. But even then the State's liability is premised upon its own negligence—and by seeking indemnification from Davis and McMahan the State attempts to shift to the contractors the economic burden of its own negligence. We are not therefore concerned with the possible negligence of Davis. Our inquiry must be directed to whether some common law theory or the parties' contract requires Davis and McMahan to indemnify the State against an expense which the State would not in this case be required to bear but for its own negligence.

The State's "implied in law" indemnity theory can be disposed of quickly. It is the law of this State that one is not entitled to be indemnified against his own negligence in the absence of a contract to that effect. *Nappanee Milling Co.* v. *Simpson Grain Co., supra*; *McLish* v. *Niagra Machine & Tool Works, supra.* As to the State's proposed "active/passive negligence" distinction, the view expressed by the court in *McLish, supra,* repudiated such a distinction:

> "It is our view of the Indiana law of indemnity that the right to indemnity may be implied at common law only in favor of one whose liability to a third person is solely derivate or constructive, and only as against one who has by his wrongful act caused such derivate or constructive liability to be imposed upon the indemnitee. If the rule is thus stated, confusion based upon 'active/passive,' 'omission/commission' or 'primary/secondary' concepts should disappear." 266 F.Supp. at 991.

We now adopt that view.

The provisions of the parties' contract upon which the State bases its claim for contractual indemnification are as follows:

"A701. Laws to Be Observed. The Contractor is assumed to have made himself familiar with, and at all times shall observe and comply with, all Federal and State laws and local bylaws, ordinances and regulations which may in any manner affect those engaged or employed in the work, or the materials or equipment used in or upon the work or which may in any way affect the conduct of the work, and no pleas of misunderstanding will be considered on account of ignorance thereof.

The Contractor shall indemnify and save harmless *the State*, the Commission, the Executive Director and all officers, agents and employees of the Commission, *from all suits, actions or claims arising from or based on the violation of any such laws, bylaws, ordinances and regulations, whether by himself or his employees, subcontractors or agents.*

\* \* \*

"A711. RESPONSIBILITY FOR DAMAGE CLAIMS.

*The Contractor shall indemnify* and save harmless *the State,* the Commission, the Executive Director, and all officers, agents and employees of the Commission *from all suits, actions or claims of any character brought on account of any injuries* or damages *sustained by any persons* or property *from neglect in safeguarding the work,* or through the use of unacceptable materials in constructing the work, *or because of any act or omission, neglect or misconduct of said Contractor,* or because of any claims or amount recovered from any infringements of patents, or for any claim or amount arising or recovered under the 'Workmen's Compensation Law,' or other law, by-law, ordinance or decree and so much of the money due said Contractor under his Contract as shall be considered necessary by the Commission may be retained for the use of the State. In case no money is due the Contractor, his surety shall be held until such suits, actions or claims for injuries or damages aforesaid shall have been settled and suitable evidence to that effect furnished the Commission." (Emphasis supplied).

We have recently reiterated the applicable guidelines for resolution of a claim for indemnification by an indemnitee, based on a contract, for the indemnitee's own negligence:

"Contracts which provide indemnification for one's own negligence may if 'knowingly and willingly' made, be valid and enforceable in Indiana. *Loper* v. *Standard Oil Co.* (1965), 138 Ind. App. 84, 211 N.E.2d 797; *Weaver* v. *American Oil Co.* (1972), 257 Ind. 458, 276 N.E.2d 144.

However, such provisions are strictly construed and will not be held to provide indemnity unless so expressed in 'clear and unequivocal' terms. *Norqus* v. *General Motors Corp.* (S.D. Ind. 1963), 218 F. Supp. 398, 399." *Vernon Fire & Casualty Ins. Co.* v. *Graham* (1975), 166 Ind. App. 509, 336 N.E.2d 829, 831.

Hence the precise issue is whether the terms of specifications A701 and A711 of the parties' contract *clearly* and *unequivocally* manifest a commitment by the contractors, knowlingly and willingly made, to pay for damages occasioned by the State's negligence.

The first step towards resolution of this question requires analysis of the "clear and unequivocal" test. In *Norkus* v. *General Motors Corp., supra,* the court followed its articulation of the test with the statement that "[a]s a general rule, it is not required that there be an express reference to the negligence of the indemnitee." 218 F. Supp. at 399. This passage was quoted in *General Accident & Fire Assurance Corp.* v. *New Era Corp.* (1966), 138 Ind. App. 349, 354, 213 N.E.2d 329, 332. However, in those cases in which the "clear and unequivocal" standard has been applied, the contract contained no express reference to the indemnitee's negligence. Indemnification was nevertheless not permitted.[4] On the other hand, in the only recent case in which our courts have permitted indemnification against one's own negligence, an explicit reference to the indemnitee's own negligence was

---

4. In *General Accident & Fire Assurance Corp.* v. *New Era Corp., supra,* we held language requiring a subcontractor to indemnify the contractor "against all claims for damages, lawsuits, etc., which may arise in connection with the fulfillment of this [contract]," 138 Ind. App. at 350, 213 N.E.2d at 330, insufficient to require the subcontractor to indemnify the contractor's subrogee against a claim for personal injuries to an employee of the subcontractor caused by the contractor's negligence. In *Vernon Fire & Casualty Ins. Co.* v. *Graham, supra,* we refused a lessor's insurer indemnification from the lessee for payments to a third person for injuries caused by the lessor's negligence. In *Vernon Fire & Casualty,* the lessee had agreed to indemnify the lessor "for damage to person or property resulting from . . . any use of the demised premises." 336 N.E.2d at 831-833. In both of these cases, we were applying the "clear and unequivocal" test drawn from *Norkus* v. *General Motors Corp., supra. See also General Telephone Co. of Indiana* v. *Penn Central Co.* (1971), 149 Ind. App. 50, 270 N.E.2d 337.

present. *Loper* v. *Standard Oil Co., supra; cf. Weaver* v. *American Oil Co.* (1972), 257 Ind. 458, 276 N.E.2d 144. A similar observation has led one commentator to take issue with the *Norkus* court's statement of the "general rule" by considering Indiana to be among the jurisdictions adhering to "the rule that there must be an *express* stipulation as to indemnity against the [indemnitee's] own negligence . . . ." 68 A.L.R. 3d 7, 77 (emphasis supplied). We believe this commentator has correctly assessed Indiana law.

In *Norkus,* the crucial language of the contract required the subcontractor to indemnify the contractor and the property owner "against all claims for damages to property or injuries to persons . . . growing out of the execution of the work." 218 F. Supp. at 399. The court held that this language did not require the subcontractor to indemnify the property owner against a claim for personal injuries suffered by an employee of the subcontractor, alleged to be a proximate result of the owner's negligence. The court reasoned that:

> "The language in the instant contract is well adapted to defining the area of application, but not to defining the cause, in terms of physical or legal responsibility; the fact that a claim may grow out of the execution of the work whether caused by the negligence of the indemnitee, the indemnitor or a third person, is the very reason why indemnity for the indemnitee's own negligence must be specifically, not generally, prescribed. *See Batson-Cook Co.* v. *Industrial Steel Erectors,* 257 F. 2d 410, 413, 414 (5th Cir. 1958)." *Norkus, supra,* 218 F. Supp. at 399-400.

We find it difficult to envision an indemnity provision which defines "the cause [of the injury] in terms of physical or legal responsibility . . . specifically, not generally . . .", and in terms which are "clear and unequivocal", which does *not* contain an express stipulation as to indemnity against the indemnitee's own negligence. The improbability of finding such a provision might alone compel the conclusion that an express stipulation is required. But we need not rest upon our own logic. Analysis of the principal case upon which the court in *Norkus* relied,

*Batson-Cook Co. v. Industrial Steel Erectors,* (5th Cir. 1958), 257 F. 2d 410, and the decisions, in other jurisdictions, to which *Batson-Cook* has led, reveal that explicit reference to the indemnitee's negligence is a prerequisite to his indemnification therefor.

Like the court in *Norqus,* the Fifth Circuit in *Batson-Cook Co.* v. *Industrial Steel Erectors, supra,* 257 F. 2d at 412, stated that no "talismanic words" such as "the indemnitee's negligence" were necessary. But in discussing what language *was* necessary, the court left precious little opening for indemnification of the indemnitee's own negligence in the absence of such terms:

> "While the language is well adapted to defining the areas of the application, it is not peculiarly apt to define causes either in terms of physical or legal responsibility. An injurious incident could arise out of, or result from, or be sustained, in connection with the performance of the work[5] whether the real or legal cause was that of the Indemnitor, the Indemnitee, or both, or equally likely, unrelated third parties. And to these questions as to what parties brought about the incident, there would have to be added inquiry whether any of those actually responsible for it were so in law. *If it could cover any one or all of the three actual possibilities and any one or more or all of the legal possibilities, it has hardly spelled out that it will cover the specific and limited, but serious, situation of negligence by the Indemnitee.* Of course, that is just the very reason for the general principles now universally accepted. *For this general approach is bottomed on the concept that this must be specifically, not generally, prescribed. It is an area in which to cover all does not include one of the parts.* Despite this emphasized phrase, it is apparent that the clause is lacking in that positive directness which the law regards as essential." 257 F. 2d at 413-414. (Emphasis supplied).

Significantly, the *Batson-Cook* decision has been relied upon

---

5. The general contractor-indemnitee had based its claim for indemnification against a claim for personal injuries by an employee of the subcontractor-indemnitor, such injuries having been proximately caused by the contractor's negligence, on a contractual provision requiring indemnification against "any and all losses 'sustained in connection with or to have arisen out of or resulting from the performance of the work by a subcontractor. . . .'" 257 F.2d at 412-413.

by decisions in other jurisdictions which come very close to an absolute insistence upon reference to "the indemnitee's negligence" as a prerequisite to indemnification therefor. *See Geurink* v. *Herlihy Mid-Continent Co.* (1966), 5 Mich. App. 154, 146 N.W.2d 111 (reh. den.) ; *Arnold* v. *Stupp Corp.* (1967), La. App., 205 So. 2d 797; *Strickland* v. *Nutt* (1972), La. App., 264 So. 2d 317; *Cole* v. *Chevron Chemical Co.- Dronite Div.* (5th Cir. 1973), 477 F. 2d 361 (applying La. law; reh. and reh. en banc den.) ; *Hollingsworth* v. *Chrysler Corp.* (1965), Del. Super., 8 Storey 236, 208 A. 2d 61. Among decisions from these jurisdictions we have found two cases in which indemnification was denied despite contract provisions almost identical to the ones upon which the State relies. We find these decisions persuasive.

In *State* v. *Interstate Amiesite Corp.* (1972), Del. Super., 297 A. 2d 41, the Supreme Court of Delaware was confronted with a fact situation strikingly similar to the instant case. A number of private citizens suffered personal injuries as a result of an automobile collision proximately caused by the defective condition of the state highway upon which the cars had been travelling. The jury found both the State Highway Department and the highway contractor negligent and liable therefor to the injured parties: the contractor for "improper construction work" and the State for "improper supervision of the work." 297 A. 2d at 43. The State sought indemnification from the contractor for that portion of the verdict which the State was required to pay. The relevant contractual provision reads as follows:

"Article 7.13 Responsibility for Damage Claims:

'The contractor shall indemnify and save harmless the Department, its officers and employees, from all suits, actions, or claims of any character brought because of any injuries or damage received or sustained by any person, persons, or property on account of the operations of the said contractor; or on account of or in consequence of any neglect in safeguarding the work; or through use of unacceptable materials in constructing the work; or because

of any act or omission, neglect, or misconduct of said contractor;' " 297 A. 2d at 43.

The Delaware court refused the State's claim for indemnification, stating that:

> ". . . we think the indemnification provision before us is not crystal clear and sufficiently unequivocal to require Amiesite to indemnify the State for damages collected for the State's own negligence. The failure of the contract to so require is fatal to the State's argument. The clause on its face applies only to such claims based on the negligence of Amiesite which may be recovered against the State. It does not purport to indemnify the State against its own acts of negligence." 297 A. 2d at 44.

In *Breaux* v. *Rimmer & Garrett, Inc.* (1975, La. App. 3d Cir., 20 So. 2d 214, the Louisiana Department of Highways sought indemnification from the contractor against the claims of property owners adjacent to the highway under construction for loss of property. The court noted that while the conduct of the contractor's employees was the physical cause of the plaintiffs' losses, it was the negligence of the State in supervising and directing the contractor's work which was the legal cause. The State claimed indemnification on the basis of a provision nearly identical to specification A711 of the State's contract herein and article 7.13 of the State of Delaware's contract in *State* v. *Interstate Amiesite Corp., supra:*

> "107.15. RESPONSIBILITY FOR DAMAGE CLAIMS. The contractor shall indemnify and save harmless the Department, its officers and employees from all suits, actions or claims of any character brought because of any injuries or damage received or sustained by any person, persons or property on account of the operations of the said contractor; or on account of or in consequence of any neglect in safeguarding the work; or through use of unacceptable materials in constructing the work; or because of any act or omission, neglect or misconduct of said contractor; . . . ." 320 So. 2d at 218.

In denying indemnification to the State in *Breaux,* the court stated that "[t]he clause does not constitute an unequivocal

expression of an intent to make the contractor liable for the acts of the Department of Highways on matters for which the department was responsible." 320 So. 2d at 219.

We would be hard pressed to deny that by agreeing with the decision in *State* v. *Interstate Amiesite Corp., supra,* we are effectively requiring an *express* stipulation as to the indemnitee's negligence. We acknowledge this effect of our affirmance.

The seeds sown by the Fifth Circuit Court in *Batson-Cook* have thus grown into a principle of specificity which clearly defeats the State's claim to indemnification in this case.

In *Warburton* v. *Phoenix Steel Corp.* (1974), Del. Super., 321 A. 2d 345, 347, *aff'd.,* (1975) Del. Super., 334 A. 2d 225, it was stated thus:

> "The requirement is that the *language* of the indemnity provision *address itself to the subject of the negligence of the indemnitee* and by its terms show a clear and unequivocal intention that the indemnitee was intended to be indemnified against its own negligence." (Emphasis supplied).

*Accord, Vinnell Co., Inc.* v. *Pacific Electric Ry. Co.* (1959), 52 Cal. 2d 411, 340 P. 2d 604 (reh. den.) ; *MacDonald & Kruse, Inc.* v. *San Jose Steel Co., Inc.* (1972), 29 Cal. App. 3d 413, 105 Cal. Rptr. 725 (with respect to the indemnitee's "active negligence") ; *Westinghouse Electric Elevator Co.* v. *LaSalle Monroe Building Corp.* (1946), 395 Ill. 429, 70 N.E. 2d 604 (reh. den.) ; *George Sollitt Construction Co.* v. *Gateway Erectors, Inc.* (7th Cir. 1958), 260 F. 2d 165 (applying Illinois law) ; *cf. U. S. Fidelity & Guaranty Co.* v. *Mason & Dulion Co.* (1962), 274 Ala. 202, 145 So. 2d 711; see also cases cited at 27 ALR 3d 663, 693, and 68 ALR 3d 7, 77.

Our "judicial policy of disfavor" towards such clauses, *Auto Owners Mutual Ins. Co.* v. *Northern Ind. Public Service Co.* (7th Cir. 1969), 414 F. 2d 192, 195, is grounded in the recognition that the obligation to insure another party against the cost of the other's own negligence is "so extraordinary and harsh . . .," *Buford* v. *Sewerage and Water Bd.* (1937), Orl. La. App., 175 So. 110, 113, with "the potential liabilities

assumed . . . awesome", *Auto Owners Mutual Ins. Co.* v. *Northern Ind. Public Service Co., supra,* that a promisor would not lightly accept such a burden knowingly and willingly. Our decision today simply implements that judicial policy.

Requiring explicit reference to the indemnitee's negligence in a contractual provision which purports to require indemnification therefor comports well with the rule as to the enforcement of such contracts. By hypothesis, such a provision is enforced only if " 'knowingly and willingly' made. . . ." *Vernon Fire & Casualty Ins. Co.* v. *Graham, supra,* 36 N.E. 2d at 831. The contractor who knowingly and willingly promises to indemnify the contractee for the latter's negligence may not successfully complain if such a requirement was made explicit by the terms of the contract.

Even casual research reveals a vast number of reported opinions filled with vehement controversy over the meaning of phrases, words, and punctuation in contractual provisions purporting to require one party to bear the burden of the other's negligence. See 27 ALR 3d 663; 68 ALR 3d 7. We are not so foolish to think that by requiring explicit language the amount of litigation upon this subject in Indiana will be appreciably reduced. But we concur with the views expressed by the dissent in *Jordan* v. *City of New York* (1957), 3 App. Div. 2d 507, 514, 162 N.Y.S. 2d 145, 152, *aff'd.,* 5 N.Y. 2d 723, 177 N.Y.S. 2d 709, 152 N.E.2d 667:

> "The lawyers who specialize in this field are well aware that clauses such as those under consideration in this case demand laborious judicial parsing, in an effort to distill the intent of the parties. Surely, at this stage, it is not too much to require them to stop waging verbal duels and to state unmistakably whether or not a contract purports to burden the indemnitor with another's negligence."

Judgment affirmed.

Buchanan, P.J. and White, J., concur.

NOTE.—Reported at 346 N.E.2d 252.