THE STATE GROUP INDUSTRIAL
(USA) LIMITED, Appellants–
Plaintiffs,

v.

MURPHY & ASSOCIATES INDUS-
TRIAL SERVICES, INC., Ap-
pellees–Defendants.

No. 82A04–0703–CV–158.

Court of Appeals of Indiana.

Dec. 28, 2007.

Reed S. Schmitt, Frick Powell Whinrey Cravens & Schmitt, LLP, Evansville, IN, Attorney for Appellant.

Marilyn R. Ratliff, Evansville, IN, Attorney for Appellee.

## OPINION

ROBB, Judge.

### Case Summary and Issues

The State Group Industrial (USA) Limited ("State Group") appeals from the trial court's judgment awarding State Group actual damages but denying State Group's request for relief under Indiana Code section 34–24–3–1. State Group raises the sole issue of whether the trial court improperly denied it relief under this statute based on a contract provision. Concluding the Contract does not proscribe the relief sought by State Group, we remand with instructions that the trial court determine whether and to what extent damages under this statute are warranted.

### Facts and Procedural History

State Group is a Delaware corporation authorized to transact business in Indiana, with its principal place of business in Evansville. Murphy & Associates ("M & A") is an Indiana corporation with a principal place of business in Evansville. In 2000, the Army Corps of Engineers (the "Corps") sought bids for a project based on the Sabine–Neches Waterway in Beaumont, Texas (the "Project"). The Project involved a control system, which would identify the salinity content of the water in the Sabine–Neches and relay the data to a control panel, which would in turn process the data and determine whether the tainter gates on the waterway's dam should be opened or closed to regulate salt water infiltration.

State Group was a prime contractor on the Project. In June 2000 M & A requested information from State Group relating to the Project and prepared an estimate for supplying materials for the control system. Jeff Erk and Steve Murphy prepared M & A's estimate, which came to $394,773. On August 9, 2000, Erk prepared a bill of materials, which listed all the materials that M & A would provide. Included in this list were Falmouth Scientific salinity probes, necessary components of the control system. On March 21, 2001, Murphy met with State Group employees to finalize the terms and conditions of the contract between M & A and State Group (the "Contract"). At this meeting, M & A confirmed that the salinity probes were part of the Contract, that M & A would provide engineering for the start-up process, and that M & A had prior experience with Corps projects.

The Contract's payment schedule was as follows:

| | |
|---|---|
| 1.1 Due Upon Contract Award | $ 20,000.00 |
| 1.2 Due Upon Approval of Submittal Drawings & Documentation | $ 5,000.00 |
| 1.3 Due Upon Receipt of Equipment at M & A | $336,895.00 |
| 1.4 Due After Customer Acceptance/Witness Testing at M & A | $ 20,002.00 |
| 1.5 Due Upon Equipment Delivery/Shipment to Customer | $ 3,250.00 |
| 1.6 Due Upon Completion of Installation & Testing | $ 15,345.00 |
| 1.7 Due Upon Receipt of Final Deliverables | $ 945.00 |
| TOTAL | $401,437.00 |

Appellant's Appendix. at 35.

On October 15, 2001, M & A submitted Invoice No. 965, which was prepared by Murphy, for payment number 1.3. Invoice No. 965 indicated that the terms of the Contract required that State Group was

required to make payment number 1.2 "Upon *Submittal* of Drawings and Documentation," instead of upon approval of these documents. *Id.* at 144 (emphasis added). Invoice No. 965 also indicated that payment number 1.3 was "Due Upon Submittal Approval/M & A *Ordering* Equipment," instead of upon receipt of the equipment. *Id.* (emphasis added). M & A had not discussed a change in payment terms with State Group. Also, at the time M & A delivered this invoice, it had not ordered or acquired any of the materials for the control system.

After receiving this invoice, State Group contacted M & A and requested proof of ownership of the materials, as the Corps required such proof before it would release payment. In response, M & A supplied State Group with documentation representing that it had paid in full for the materials, and that no other party had any claim on the materials. These representations were false. The trial court found that Murphy knew or should have known these representations were false and that he "made misleading written statements with the apparent intent to receive payment from the Corps." *Id.* at 149.

On January 30, 2002, Murphy sent a letter to State Group indicating that payment on Invoice No. 965 was 107 days past due, at which time Murphy "knew or should have known that such representation was false and that according to the contract terms Invoice No. 965 was not due and payable until 60 days after the materials had been received at [M & A]." *Id.* Over the next few months, State Group made payments to M & A, making the final payment on May 6, 2002. M & A did not make its first payment to its supplier until three days after it received this final payment.

On August 19, 2002, M & A shipped materials to Beaumont. This shipment did not include the salinity probes and necessary cabling. On October 28, 2002, State Group forwarded a letter to M & A informing it of the missing equipment. On November 11, 2002, State Group sent another such letter. On December 18, 2002, State Group's General Manager, Steve Theodoru, met with Murphy to discuss the missing materials. Theodoru stated that he would be willing to discuss with the Corps the possibility of M & A receiving payment from the Corps on a "compassionate basis." *Id.* at 154. Following discussions, the Corps indicated that it was not inclined to provide such relief.

On January 18, 2003, State Group notified M & A that State Group needed to review the software programming developed by M & A. On February 12, 2003, State Group provided M & A with a forty-eight-hour deficiency notice requesting supply of the salinity probes and cabling. M & A failed to supply the materials, and State Group was forced to hire a replacement subcontractor, KAPOS Machine Control. Additionally, M & A refused to provide the necessary software and start-up procedures, stating that it would begin these procedures after money it claimed State Group owed in relation to alleged finance charges and labor cost increases was placed in escrow. At this point, M & A also took the position that the salinity probes were not part of the Contract. State Group purchased the missing materials from KAPOS, and incurred additional on-site expenses resulting from M & A's breach.

On April 2, 2003, M & A filed a complaint against State Group alleging breach of contract. On May 8, 2003, M & A filed its amended complaint. On May 8, 2003, State Group filed its response, affirmative defenses, and counterclaim alleging that M & A breached the Contract. On July 26, 2005, State Group filed its amend-

ed counterclaim, apparently adding a claim of fraud and seeking damages under Indiana Code section 34–24–3–1 (the "Crime Victims Statute").[1] The trial court held a bench trial over five days in January 2006, and issued its judgment, along with findings of fact and conclusions of law, on July 28, 2006.

The trial court concluded that M & A breached the Contract by failing to supply the salinity probes and cabling. The trial court also concluded that M & A knowingly made numerous false or misleading statements or representations. The trial court awarded State Group actual damages in the amount of $141,943.22. However, the trial court refused to award State Group attorney's fees, pre-judgment interest, or any other damages outside of the direct expenses caused by M & A's breach. The basis for the trial court denying State Group these damages was its conclusion that "[t]he Contract entered into between the parties does not provide for reimbursement of legal fees in the event that [M & A] is found to be in breach. The Contract also limits [M & A's] liability to actual damages and excludes loss of profits, special, consequential or exemplary damages." *Id.* at 163. State Group now appeals, arguing that the trial court should have awarded it additional damages despite this Contract provision.

*Discussion and Decision* [2]

■ In this case, the trial court entered findings of fact and conclusions of law along with its judgment. In such situations, we generally apply a two-tiered standard of review, first determining whether the evidence supports the findings, and then determining whether the findings support the judgment. *See Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind.1997). However, no challenge has been raised as to the propriety of any factual finding, and the only issue raised on this appeal—whether the Contract proscribes relief under the Crime Victims Statute—is a question of law that we will review de novo. *See State Farm Mut. Auto. Ins. Co. v. Cox*, 873 N.E.2d 124, 127 (Ind.Ct.App. 2007) (noting that where there are no disputed facts, and the sole issue involves the interpretation of a contract, this court will review the matter de novo).

■ Under the Crime Victims Statute, "[i]f a person suffers a pecuniary loss as a result of a violation of IC 35–43 ... the person may bring a civil action against the person who caused the loss for" treble damages, the costs of the action, and reasonable attorney's fees. The trial court concluded that M & A violated Indiana Code section 35–43–5–3, deception, by knowingly and intentionally making false or misleading statements with the intent to

---

1. State Group did not include this amended complaint in its appendix. We direct counsel to Indiana Appellate Rule 50(A)(2)(f), which indicates that the appellant's appendix "shall contain ... pleadings or other documents ... that are necessary for resolution of the issues raised on appeal." This amended complaint, in which State Group first requested the relief they seek on this appeal, is such a pleading. However, we will address the issue on the merits, as it is plain from other documents in the Appellant's Appendix, including the trial court's findings of fact and conclusions of law, that State Group did in fact file a claim

alleging fraud and seeking treble damages under the Crime Victims Statute.

2. M & A has not filed an appellate brief in this case. We surmise that M & A has declined to do so because it filed a Chapter 7 bankruptcy petition on May 23, 2007. The bankruptcy case was closed on August 16, 2007. The present issue is not moot, as M & A has not dissolved and, unlike cases involving individual debtors, Chapter 7 cases involving corporations do not result in a discharge of the corporation's liabilities. *In re Am. Telecom Corp.*, 304 B.R. 867, 872 (N.D.Ill.2004).

obtain payment from State Group.[3] Neither a criminal conviction nor proof beyond a reasonable doubt is required to trigger the Crime Victims Statute. *Gilliana v. Paniaguas,* 708 N.E.2d 895, 899 (Ind.Ct. App.1999), *trans. denied.* Therefore, the trial court's conclusion, which was supported by its factual findings, was sufficient to entitle State Group to bring an action under the Crime Victims Statute.

■ However, the trial court concluded that under the Contract, State Group was precluded from receiving "any damages not directly related to the installation of salinity probes, fiber optic cabling software and other related items (the probes and a complete control system) to operate the salinity probes." Appellant's App. at 163. The trial court therefore declined to award damages under the Crime Victims Statute.

State Group asks us to hold that a contract provision exempting a party from liability under this section is void for violating public policy. Such an issue is also one that this court reviews de novo. *See Trotter v. Nelson,* 684 N.E.2d 1150, 1153 (Ind.1997) ("Whether a contract is against public policy in this situation would be a question of law."), *abrogated on other grounds, Liggett v. Young,* 877 N.E.2d 178 (Ind.2007). Although we have found no Indiana decision indicating that a party may not contract against liability for intentional tortuous acts, this rule has a general consensus among our sister states. *See Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship,* 115 Hawai'i 201, 166 P.3d 961, 984 (2007) ("[P]ublic policy would forbid the making of contracts excluding [from liability] intentional torts."); *Holmes v. Clear Channel Outdoor, Inc.,* 284 Ga. App. 474, 644 S.E.2d 311, 314 (2007) ("Exculpatory clauses ... are not void as

against public policy unless they purport to relieve liability for acts of gross negligence or willful or wanton conduct."); *Hojnowski v. Vans Skate Park,* 187 N.J. 323, 901 A.2d 381, 386 (2006) ("It is well settled that to contract in advance to release tort liability resulting from intentional or reckless conduct violates public policy."); *Daimler Chrysler Corp. v. Graves Sheet Metal,* 827 N.E.2d 607, 613 (Ind.Ct.App.2005) ("Under Michigan law, a party may not contract against liability for his own gross negligence."); *Keenan Packaging Supply, Inc. v. McDermott,* 13 Neb.App. 710, 700 N.W.2d 645, 655 (2005) ("[P]ublic policy prevents a party from limiting its damages for gross negligence or willful and wanton misconduct."); *Atkins v. Swimwest Family Fitness Ctr.,* 277 Wis.2d 303, 691 N.W.2d 334, 340 (2005) ("A waiver of liability for an intentional act would clearly place the exculpatory clause in violation of public policy."); *Dargis v. Paradise Park, Inc.,* 354 Ill.App.3d 171, 289 Ill.Dec. 420, 819 N.E.2d 1220, 1232 (2004) ("[P]ublic policy does not allow exculpatory contracts that protect against liability for willful and wanton misconduct."); *Richards & O'Neil, LLP v. Conk,* 774 N.E.2d 540, 547 (Ind.Ct. App.2002) (recognizing that under New York law, "[a]n exculpatory clause is unenforceable when the misconduct from which it would grant immunity smacks of intentional wrongdoing"); *Schlobohm v. Spa Petite, Inc.,* 326 N.W.2d 920, 923 (Minn. 1982) ("If the clause ... purports to release the benefited party from liability for intentional, willful or wanton acts, it will not be enforced."); *cf. Manderville v. PCG & S Group, Inc.,* 146 Cal.App.4th 1486, 55 Cal.Rptr.3d 59, 69 (2007) (recognizing that under California statute, "a party to a contract is precluded ... from

---

**3.** A person commits deception if he "knowingly or intentionally makes a false or misleading written statement with intent to obtain property, employment, or an educational opportunity." Ind.Code § 35–43–5–3(a)(2).

contracting away his or her liability for fraud or deceit based on intentional misrepresentation"), *review denied.* Research has disclosed no state allowing parties to contract out of liability for future intentional torts. However, even if Indiana would not find this clause contrary to public policy,[4] we conclude that under principles of contract construction, the Contract does not even purport to bar recovery under the Crime Victims Statute.

The relevant provision in the Contract states:

> The remedies specified in this Agreement shall constitute [State Group's] sole and exclusive remedy in the event of any alleged default, negligence, breach of contract or any other legal or equitable claim that may be brought against [M & A]. Under no circumstances shall [M & A] be liable for any loss of profits or for special, consequential or exemplary damages, even if [M & A] knows or should have known of the possibility of such damages. In any event, it is expressly understood and agreed that the total liability, if any, of [M & A], for any action taken or omitted under the terms of this Agreement, shall be limited to the total payment amount received by [M & A] for the performance of this Agreement. No action, regardless of form, arising out of this Agreement, may be brought by [M & A] unless such action is brought within one year after the cause of action has accrued.

Appellant's App. at 37.

 Recovery under the Crime Victims Statute is not based on a breach of contract, but must be predicated on an independent tort. *See* Ind.Code § 34–24–3–1 (allowing a party to bring an action if it "suffers pecuniary loss *as a result of [certain crimes]*" (emphasis added)); cf. *First Fed. Sav. Bank of Ind. v. Galvin,* 616 N.E.2d 1048, 1056 (Ind.Ct.App.1993) ("The punitive damages are awarded for the tort, not the breach of contract."), *trans. denied.* Although no Indiana case discusses the validity of a contract provision purporting to limit liability for intentional torts or criminal acts, under Indiana law, a contract may release a party from liability for damages caused by its own negligence. *Marsh v. Dixon,* 707 N.E.2d 998, 1000 (Ind.Ct.App.1999), *trans. denied.* Although such releases are legal, such a release must "*clearly* and *unequivocally* manifest a commitment by [the plaintiff], knowingly and willing [sic] made, to pay for damages occasioned by [the defendant's] negligence." *Id.* (quoting *Ind. State Highway Comm'n v. Thomas,* 169 Ind.App. 13, 346 N.E.2d 252, 260 (1976) (emphasis in original)). Therefore, exculpatory clauses seeking to indemnify a party against its own negligence "must specifically and explicitly refer to the negligence of the party seeking release from liability." *Avant v. Cmty. Hosp.,* 826 N.E.2d 7, 10 (Ind.Ct.App.2005), *trans. denied.* Based on this rule, we have declined to release parties from liability based on exculpatory provisions phrased in general terms. *See Powell v. American Health Fitness Ctr. of Fort Wayne, Inc.,* 694 N.E.2d 757, 761–62 (Ind.Ct.App.1998) (clause stating that party released health club from liability for

---

4. We note, however, that this transaction affected a project aimed at ensuring the safety of a community's river water. As we have previously noted, we are more likely to hold an exculpatory clause to be against public policy "when the transaction affects the public interest such as utilities, carriers, and other types of businesses generally thought to be suitable for regulation or which are thought of as a practical necessity for some members of the public." *Gen. Bargain Ctr. v. American Alarm Co.,* 430 N.E.2d 407, 411–12 (Ind.Ct. App.1982).

"any damages" and "fully and forever release[s] and discharge[s]" the club "from any and all claims, demands, damages, rights of action, or causes of action present or future" did not "specifically or explicitly refer to the negligence of [the club]" and therefore did not limit the club's liability for its own negligence).

The indemnification clause in this case lacks the requisite specificity, as it in no way refers to criminal or fraudulent conduct on the part of M & A. In this sense, it "contains no clear statement that would give [State Group] notice of the harsh burden that complete indemnification imposes." *Exide Corp. v. Millwright Riggers, Inc.*, 727 N.E.2d 473, 480 (Ind.Ct.App. 2000), *trans. denied.* We hold that the Contract did not protect M & A from liability under the Crime Victims Statute stemming from M & A's intentional misrepresentations.[5]

#### Conclusion

We conclude that the Contract did not explicitly protect M & A from liability for damages stemming from its own fraudulent representations. Having found that the Contract did not preclude damages under the Crime Victims Statute, we remand to the trial court with instructions that it exercise its discretion in determining whether to award damages and the amount of any damages.[6] *See MCS Laser-Tec, Inc. v. Kaminski*, 829 N.E.2d 29, 35 (Ind.Ct.App.2005) ("[T]he award of damages above the actual damages is within the discretion of the trial court.").

Remanded.

KIRSCH, J., and BARNES, J., concur.

---

5. Even in the absence of a specific and explicit indemnification statement, we have upheld release clauses where the damages "are inherent in the nature of the activity." *Anderson v. Four Seasons Equestrian Ctr., Inc.*, 852 N.E.2d 576, 585 (Ind.Ct.App.2006), *trans. denied.* We are not willing to hold that the risk that a party to a contract will commit the crime of deception is inherent in the nature of business transactions.

6. As the trial court has already heard all the relevant evidence, the trial court should make this determination without holding any additional hearings.