**PLAN–TEC, INC., Defendant-Appellant,**

v.

**Ivan WIGGINS and Janice Wiggins, Plaintiffs-Appellees,**

**The Blakley Corporation, Defendant-Appellee,**

**Taylor Brothers Construction Company, Third-Party Defendant-Appellee,**

**Terstep Company, Inc., Third-Party Defendant-Appellee.**

No. 1–881A250.

Court of Appeals of Indiana, First District.

Jan. 11, 1983.

---

1214

James E. Bourne, Richard T. Mullineaux, Orbison O'Connor MacGregor & Mattox, New Albany, for defendant-appellant.

Roger L. Pardieck, David W. Paugh, Montgomery, Elsner & Pardieck, Seymour, for appellees Ivan Wiggins and Janice Wiggins.

Ernest W. Smith, Fox & Smith, Jeffersonville, for appellee The Blakley Corp.

R. Gregory Neely, John A. Cody, Jr., Cody & Cody, New Albany, for appellee Terstep Co., Inc.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Defendant Plan-Tec, Inc. appeals from a jury verdict in the Clark Circuit Court awarding plaintiffs Ivan and Janice Wiggins damages for employment-related injuries sustained by Ivan and denying Plan-Tec's crossclaim against the Blakley Corporation and its third-party complaint against the Terstep Company, Inc.[1] We affirm.

## FACTS

This case arises from a construction-related injury suffered by the plaintiff Ivan Wiggins and his wife's consequent loss of consortium. Wiggins was employed as a journeyman carpenter by Terstep Company, Inc. Terstep was, in turn, one of a number of subcontractors engaged in providing services for the North Clark Community Hospital project in Charlestown, Indiana. The hospital project was not undertaken according to the traditional general contractor/subcontractor model. Rather, Plan-Tec assumed the role of construction manager and, acting as the hospital's agent, negotiated contracts between the owners and the contractors. As the construction manager, Plan-Tec coordinated the project from inception to completion and was paid a flat fee therefor. The Charlestown job was Plan-Tec's first job as a construction manager.

On the day of the accident Wiggins was to change expansion joints on the exterior skin of the building in order to suit the architect's modifications. Plan-Tec informed the Blakley Corporation of the need to change the expansion joints. Blakley discussed this with both its subcontractors for exterior work, one of which was Terstep.[2] Both said this was not work within the contemplation of their contracts. Plan-Tec then assumed the responsibility for the work order and had it performed by Terstep.

Wiggins and a co-worker, Frank Bratcher, were assigned to complete the job of changing the expansion joints. Both men went to the roof to check the outrigging and counterweighting of the suspended scaffold from which they would be working. While the outrigging was generally coun-

1. Plan-Tec had also filed a third-party complaint against Taylor Brothers Construction Company. Taylor was awarded judgment on the evidence at the conclusion of Plan-Tec's case-in-chief. That judgment is not being appealed in the present action.

2. Plan-Tec had negotiated a contract with Terstep and then assigned the Terstep contract to Blakley.

terweighted by punching holes in the precast concrete roof and anchoring the scaffold to the building via steel cables run through the holes in the roof, in this case the outrigging was counterweighted by five-gallon buckets of hardened concrete. Bratcher informed Wiggins that the roofers were working in that area and it was, therefore, not possible to drive holes into the roof. He also stated that the buckets had been used before.

After testing the scaffold at ground level, the two men raised the scaffold to the sixth floor where they were to work. As Bratcher went to Wiggins's end of the scaffold to demonstrate the work to be performed, the structure broke loose and fell to the ground below.

Wiggins initiated this action against Plan-Tec, Blakley, Taylor, and Terstep and was awarded $700,000.00 in damages against Plan-Tec for its failure to ensure proper safety on the job. Janice Wiggins was awarded $50,000.00 for loss of consortium. Plan-Tec's third-party claim against Terstep for indemnity was also denied. From this action Plan-Tec now appeals.

## ISSUES

Appellant presents fourteen issues for review. Combined and rephrased, the issues are as follows:

1. Did the trial court err in upholding the jury's verdict?

2. Did the trial court err in not granting Plan-Tec's motion for judgment on the evidence at the close of all the evidence?

3. Did the trial court err in giving Terstep's instruction number 10B?

4. Did the trial court err in denying Plan-Tec's motion for continuance?

5. Did the trial court err in giving Wigginses' instructions numbered 2 and 9?

6. Did the trial court err in refusing to give Plan-Tec's tendered instruction number 9?

7. Did the trial court err in refusing to give Plan-Tec's tendered instruction number 5?

8. Did the trial court err in allowing certain testimony of Anthony Rago in contravention of Plan-Tec's motion in limine?

9. Did the trial court err in refusing to permit Plan-Tec relief from Wigginses' motion in limine?

10. Did the trial court err in excluding certain deposition testimony of James Vest?

11. Did the trial court err in permitting Nicholas Hatfield to testify regarding Terstep's inability to negotiate the terms of the general conditions of the contract?

## DISCUSSION AND DECISION

*Issue One*

The trial court did not err in upholding the jury's verdict.

Central to Plan-Tec's argument on appeal is its contention that Plan-Tec owed no duty to Wiggins as a matter of law. Since no duty existed, argues Plan-Tec, the award by the jury was contrary to law and the trial court, therefore, erred in upholding the jury's verdict. Wigginses argue that a duty arose from the contract itself or, in the alternative, that Plan-Tec gratuitously assumed the duty of care for the employees of Terstep and that a breach of such duty gave rise to actionable negligence. We agree with the Wigginses' latter contention.

In reviewing an allegation that a jury verdict is contrary to law, the verdict will be set aside only where it is against the evidence, where there is a total lack of evidence, or where it is contrary to uncontradicted evidence. *Sutton v. Roth, Wehrly, Heiny, Inc.,* (1981) Ind.App., 418 N.E.2d 229, 232, *trans. denied.* This court will not reweigh evidence or resolve the credibility of witnesses. *Riverside Insurance Co. v. Pedigo,* (1982) Ind.App., 430 N.E.2d 796, 803. Rather, our inquiry is limited to determining whether the verdict is sustained by substantial evidence of probative value. *Id.* Further, this court will indulge every reasonable presumption in favor of the correctness of the jury's verdict. *Illinois Central Gulf Railroad Co. v. Parks,* (1979) Ind.App., 390 N.E.2d 1073, 1074, *trans. denied.*

Where the evidence is susceptible to reasonably differing interpretations, the jury's verdict will not be disturbed.

■■■ In bringing a negligence action the burden of proving negligence is upon the plaintiff. *Hi-Speed Auto Wash, Inc. v. Simeri,* (1976) 169 Ind.App. 116, 119, 346 N.E.2d 607, 608. In order to prevail upon an allegation of negligence, the plaintiff's evidence must be sufficient to demonstrate the existence of all the requisite elements of the cause of action. *Koroniotis v. La-Porte Transit, Inc.,* (1979) Ind.App., 397 N.E.2d 656, 659. One of those elements is a duty owed to the plaintiff by the defendant. *Bowling v. Holdeman,* (1980) Ind.App., 413 N.E.2d 1010, 1014; *Koroniotis.* Absent such a duty there can be no actionable negligence.

■■■ A duty of care, the breach of which will support a negligence action, may arise contractually. *See Perry v. Northern Indiana Public Service Co.,* (1982) Ind.App., 433 N.E.2d 44, 47–48, *trans. denied; Cummings v. Hoosier Marine Properties, Inc.,* (1977) 173 Ind.App. 372, 382–83, 363 N.E.2d 1266, 1273, *trans. denied* (1978); *Jones v. Indianapolis Power & Light Co.,* (1973) 158 Ind.App. 676, 690, 304 N.E.2d 337, 346, *trans. denied* (1974). The extent of the duty owed, if any, is a matter of contractual interpretation. In determining whether a duty exists, this court will give effect to the intent of the parties as reflected by the language of the document. *English Coal*

*Co., Inc. v. Durcholz,* (1981) Ind.App., 422 N.E.2d 302, 308, *trans. denied.* Where the contract affirmatively evinces an intent on the part of the parties to charge one party with a duty of care, actionable negligence may be predicated upon the contractual duty.

In the instant case, the general conditions of the contract unequivocally state that the contractors are to have the responsibility for project safety and the safety of their employees.[3] Wigginses do not dispute this. Rather, they argue that in negotiating certain contracts, Plan-Tec contractually accepted the duty to maintain safety on the project. We cannot agree.

Initially, the project was to have had a utility contractor who would do general work and also be responsible for safety considerations.[4] Taylor Brothers originally budgeted for the safety aspects of the job. However, these were written out of Taylor Brothers' contract. In fact, no contractor was ever designated as the utility contractor. Wigginses assert that the utility contractor's job was written into Plan-Tec's contract by virtue of the inclusion in Plan-Tec's contract of certain aspects of the utility contractor's job.[5] While Plan-Tec agreed to perform certain aspects of the utility contractor's job which were necessary to the completion of the project, it does not necessarily follow that Plan-Tec, therefore, agreed to perform all aspects of the utility contractor's job. Clearly, certain functions, such as temporary heat, drinking water,

---

3. Paragraph 10.1.1 of the general conditions provides that "[t]he Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with his Work." Record at 981. Additionally, paragraph 10.2.2 provides, in part that "[i]n no case shall the Owner, the Construction Manager, the Architect or their respective employees and agents have either direct or indirect responsibility for matters relative to Project safety." *Id.*

4. Paragraph 5.1.1.5 describes the utility contractor as "that Contractor responsible for general and miscellaneous construction." Record at 981. Paragraph 10.2.2 provides, in part, that "The Utility Contractor shall assume overall responsibility for all matters relative to safety on this Project, and for correction of un-

safe conditions, regardless of which Contractor, Subcontractor or trade is directly responsible. He shall designate one individual within his organization to act as Safety Director for the Project, who shall continuously inspect the Project site and oversee the correction of all hazardous or unsafe conditions." *Id.*

5. Taylor Brothers' bid for general conditions work included supplying a field office, barricades and safety protection, clean-up, temporary heat, telephone, drinking water, a project sign, fire protection, final clean-up, temporary latrines, equipment rental, and temporary roads. After being written out of Taylor Brothers' contract, these items appeared as part of Plan-Tec's contractual duties.

and toilet facilities were necessary to enable the workers to bring the project to a successful conclusion. Plan-Tec, therefore, contractually accepted the responsibility for providing these services. However, in view of Plan-Tec's express disavowance of responsibility for safety considerations, the mere addition of some of the utility contractor's duties to its own is not sufficient to indicate that Plan-Tec contractually agreed to provide for on-the-job safety. Plan-Tec cannot be said to have contractually accepted a duty of care by which a negligence action may be supported.

██ A duty of care may also arise where one party assumes such a duty, either gratuitously or voluntarily. *Perry,* 433 N.E.2d at 49–50; *Clyde E. Williams & Associates, Inc. v. Boatman,* (1978) 176 Ind.App. 430, 435, 375 N.E.2d 1138, 1141, *trans. den.* (1979). The assumption of such a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person. *Perry,* 433 N.E.2d at 49; *Clyde E. Williams.* Failure to act in a reasonable manner will give rise to an action for negligence.

 Generally, a landowner has a common law duty to exercise care to keep his property in a reasonably safe condition for invitees or business visitors. *See Curl v. Bethlehem Steel Corp.,* (1979) Ind.App., 390 N.E.2d 709, 712; *Cummings,* 173 Ind.App. at 382–83, 363 N.E.2d at 1273; *Hoosier Cardinal Corp. v. Brizius,* (1964) 136 Ind.App. 363, 376–77, 199 N.E.2d 481, 487–88, *trans. denied.* This obligation exists where an injury is reasonably foreseeable in light of the hazardous nature of the instrumentalities maintained by the party on his premises. *Denneau v. Indiana & Michigan Electric Co.,* (1971) 150 Ind.App. 615, 617–18, 277 N.E.2d 8, 11, *trans. denied* (1972). However, where the instrumentality is that of an independent contractor, the complainant must show either that the landowner assumed control of the instrumentality or had superior knowledge of the potential dangers involved in its operation. *See Jones v. Indianapolis Power & Light Co.,* (1973) 158 Ind.App. 676, 687, 304 N.E.2d

337, 344, *trans. denied.* In *Jones,* plaintiff's decedent was fatally injured while operating a hoist for his employer, a subcontractor employed by Indianapolis Power and Light Company (Ipalco) to furnish and install boiler equipment in a power plant then under construction. In affirming the trial court's judgment on the evidence against the administratrix, the court noted that

"[t]he law of this state is that a party in the position of Ipalco is obligated to take necessary steps to prevent injury to an independent contractor's employee only when such injury is reasonably foreseeable in light of the hazardous nature of instrumentalities *maintained by the party on his premises.* No evidence was presented which could give rise to a reasonable inference that Ipalco ever assumed control over the maintenance or operation of the hoist, or had *superior* knowledge of the potential danger involved in its operation by Combustion [the subcontractor]. Ipalco's sole employee on the premises admittedly had some knowledge that the limit control switch had previously caused the hoist to stick— knowledge that he *shared* with Combustion. Ipalco had no duty to Decedent under these circumstances."

*Id.* at 687, 304 N.E.2d at 344 (Citations omitted; emphasis in the original.) *See also Hale v. Peabody Coal Co.,* (1976) 168 Ind.App. 336, 347–48, 343 N.E.2d 316, 324–25 (duty to provide employees of independent contractor with safe place to work does not extend or relate to instrumentalities within the sole control of the independent contractor's employees). *Accord Curl,* 390 N.E.2d at 712; *Smith v. P. & B. Corp.,* (1979) Ind.App., 386 N.E.2d 1232, 1238, *trans. denied; Denneau,* 150 Ind.App. at 617–18, 277 N.E.2d at 11. The court in *Jones* made it clear that while a party is generally only responsible for "instrumentalities maintained by the party on his premises," *Jones,* 158 Ind.App. at 687, 304 N.E.2d at 344, the owner may become liable by assuming control over the instrumentality or by possessing a superior knowledge of the potential danger involved in its operation.

In the instant case, Wiggins was injured when the scaffold on which he was working failed and plunged to the ground. The scaffold, outrigging, and counterweights were all the property of Terstep. They were used exclusively for the benefit of Terstep's employees to enable them to perform the tasks necessary to the completion of the job. As a general proposition, under these facts, Plan-Tec's duty to provide Wiggins with a safe place to work would not extend to the operation of the scaffold which was owned and erected by Terstep and operated for the benefit of Terstep's employees. *Jones.* However, as the court in *Jones* noted, if Plan-Tec assumed a duty to provide Wiggins a safe place to work by maintaining or operating the scaffold itself, actionable negligence could be predicated upon the assumption of such a duty.[6]

■ Whether a party has assumed a duty and the extent of such a duty, if any, are questions for the trier of fact. *Perry,* 433 N.E.2d at 50. In *Perry,* a contractor's employee was seriously injured when he fell from an elevated fan housing where he had been sent to weld without scaffolding or other safety apparatus. In reversing the trial court's entry of summary judgment as to whether Nipsco (the utility) assumed the duty of job-site safety, the court recognized that by its actions Nipsco may have undertaken a duty which it had not undertaken by its contract. While the contract did not place the duty upon Nipsco, the utility did hold regular safety meetings for the employees and had safety men on the site. The court stated that this was sufficient to allow the question of assumption of the duty to go to the jury and reversed the summary judgment on that basis.

■ The factual circumstances of the instant case are similar to those in *Perry.* In *Perry,* the court determined that there was sufficient evidence to warrant a jury's decision where Nipsco held safety meetings and had safety men on the site. In the instant case, while the testimony at trial was conflicting, there was evidence which indicated that Plan-Tec apparently appointed H.L. (Curly) Goodwin as its safety director. Plan-Tec also initiated weekly safety meetings and directed that certain safety precautions, such as building guard rails around floor openings and wearing hard hats in working areas, be taken by the contractors. In addition, Goodwin himself testified that he inspected the scaffolding each morning. This is sufficient evidence upon which to present to a jury the questions of whether Plan-Tec assumed a duty to provide Wiggins with a safe place to work by inspecting the scaffolding each morning and whether Plan-Tec assumed a duty for the overall safety aspects of the project by appointing a safety director, holding safety meetings, and issuing directives concerning safety.

Plan-Tec argues in its reply brief that, an assumption of duty notwithstanding, its actions toward Wiggins constitute nonfeasance, a complete omission or failure to perform, rather than misfeasance, a negligent performance, and as such, Wiggins may predicate no liability upon an assumed duty absent reliance on his part. Plan-Tec correctly notes that where nonfeasance is involved in the assumption of a duty undertaken gratuitously or voluntarily, liability may arise only where beneficiaries have actually relied on the performance. *Board of Commissioners of Monroe County v. Hatton,* (1981) Ind.App., 427 N.E.2d 696, 700, *trans. denied.* In *Board of Commissioners of Monroe County,* the court overturned an award for the plaintiff in a personal injury action. Plaintiff was struck by a motorist whose vision was obscured by natural growth in the bend of a road. While the county indicated that its policy was to mow an area three feet wide on each side of the road, residents indicated that the growth had not been cut by anyone, including the county, since at least 1972. The court noted that the factual situation revealed a case of nonfeasance, or a complete failure to per-

---

**6.** Wigginses do not contend that Plan-Tec had a superior knowledge of the potential danger involved in the use of the scaffold.

form, as opposed to misfeasance. Since the plaintiff did not actually rely upon the county to perform the mowing, no actionable negligence could be predicated upon the county's failure to act.

Plan-Tec contends that nonfeasance is also involved in the present case. We do not agree. As we previously noted, Plan-Tec undertook to inspect the scaffolding and perform certain other safety-related duties and then failed to perform them adequately. This does not involve a complete failure to perform, but rather, involves a negligent performance. Plan-Tec argues that since it did nothing to aggravate the situation or make it more dangerous, there could be no negligent performance. *Board of Commissioners of Monroe County,* 427 N.E.2d at 700. While the court in *Board of Commissioners of Monroe County* does make such a statement, we do not feel that it was meant to limit instances of misfeasance to those particular circumstances. Rather, that statement appears to be directed to the specific facts of that case. Here, Plan-Tec, by its agents, undertook and continued to perform safety-related functions, including the inspections of the scaffolding. Once performance is attempted, the performer must act in the manner of a reasonably prudent person. Failure to do so will result in liability.

Plan-Tec also argues that there was no reliance on the part of Terstep's employees. While the record clearly shows this to be true, it is of no consequence as reliance is not an issue in a case involving misfeasance. Plan-Tec further argues that Goodwin did not claim to have any knowledge of scaffold rigging or safety and that he never gave directions or advice on these subjects. While there is conflicting evidence on whether Goodwin gave safety advice, it is clear that Goodwin did make regular inspections of the scaffolding. The fact that Goodwin never claimed to have any knowledge of scaffold rigging is also of no conse-

quence. Once a duty is undertaken, purported ignorance is not an excuse for substandard performance and will not excuse Plan-Tec from the duty it assumed by its actions.

Plan-Tec contends that the jury's verdict must be reversed as contrary to law. A verdict is contrary to law only where the evidence is without conflict and leads to but one conclusion and the verdict is contrary to that conclusion. That cannot be said in this case.

*Issue Two*

The trial court did not err in refusing to grant Plan-Tec's motion for judgment on the evidence at the close of all the evidence.

Plan-Tec contends that because of an express indemnity provision contained in the general conditions of the contract, any judgment rendered against Plan-Tec must be fully indemnified by Terstep, where such judgment arises from injuries caused at least in part by the contractor's negligence. Terstep argues that the work involved was work done outside the contract and, therefore, is not subject to the indemnity provisions. We agree with Terstep's contentions.

■ It is well settled in Indiana that contracts providing for indemnification of one's own negligence are valid if knowingly and willingly made.[7] *Center Township of Porter County v. City of Valparaiso,* (1981) Ind.App., 420 N.E.2d 1272, 1274, *trans. denied; Vernon Fire & Casualty Insurance Co. v. Graham,* (1975) 166 Ind.App. 509, 511, 336 N.E.2d 829, 831. However, such provisions are strictly construed and are held not to provide for indemnity unless so expressed in clear and unequivocal terms. *Indiana State Highway Commission v. Thomas,* (1976) 169 Ind.App. 13, 26–32, 346 N.E.2d 252, 260–63, *trans. denied.* The indemnity provisions of the general conditions of the contract provide, in part, as follows:

---

**7.** While this is generally true, our legislature has declared broad form indemnity clauses in construction and design contracts in which the promisee seeks to indemnify his own negligence to be unenforceable. *See* Ind.Code § 26–2–5–1 (1982). However, that section does not effect agreements entered into prior to July 1, 1975, and so is of no consequence in the instant case. *See* 1975 Ind. Acts, Pub.L. 276, § 2.

"The Contractor shall indemnify, hold harmless, protect, and defend the Owner, the Construction Manager and the Architect, or any one or combination of them, or any of their agents or employees from and against all claims, damages, losses and expenses including attorneys' fees arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (1) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property including the loss of use resulting therefrom, and (2) is caused in whole or in part by any negligent act or omission or breach of warranty, express or implied, by the Contractor, his Subcontractors, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder."

Record at 981 (paragraph 5.16.1). The term work is defined, in pertinent part, as "all labor, materials, tools, equipment, accessories, services and the like necessary to produce the construction required by the Contract Documents...." *Id.* (paragraph 1.1.-3). The general conditions of the contract further indicate that

"The Contract Documents consist of the following:

.1 The Agreement between the Owner and the Contractor, hereinafter referred to as 'the Agreement';

.2 The Project Manuals, the contents of which are set out in their Tables of Contents;

.3 The Drawings, consisting of;

Architectural/Structural

Mechanical/Electrical

.4 Addenda, if any, issued prior to execution of the Agreement;

.5 Modifications, if any, issued subsequent to execution of the Agreement; and

.6 Industry Standards, Manufacturer's Specifications, Laws, Codes, Rules, Regulations, and the like made a part of the Contract Documents by reference.

A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a written interpretation issued by the Architect pursuant to Subparagraph 1.2.5, or (4) a written order for a minor change in the Work issued by the Construction Manager pursuant to Paragraph 12.3."

*Id.* (paragraph 1.1.1). The general conditions provide that "[t]he Contract Documents form the Contract." *Id.* (paragraph 1.1.2). They also provide that "[t]he Contract may be amended or modified only by a Modification as defined...." *Id.*

 In the present case, there is evidence in the record which supports Terstep's contention that the work performed in replacing the expansion joints was extra work performed at Plan-Tec's insistence. The only reflection of the proposed change was in a number of letters between the parties discussing the proposed change. No indication of the change was ever made in a manner consistent with the provisions of the general conditions of the contract. In fact, testimony indicates that the only records other than the letters between the parties are the work orders submitted by Terstep and the checks given by Plan-Tec in payment thereof. It is well settled that this court will construe a self-exculpatory indemnity agreement strictly against the party protecting itself thereby. *Indiana State Highway Commission v. Thomas.* The change which gave rise to Wiggins's injuries was not documented by other than Terstep's submission of work orders for payment and Plan-Tec's checks in payment thereof, plus several preceding letters of explanation. The change was not part of the contract as described by the general conditions because it did not conform to the contractual requirements for modification as drafted by Plan-Tec. As such, the work done by Terstep in changing the expansion joints was not subject to the indemnity provision of the general conditions. We cannot say that Plan-Tec was entitled to indemnity as a matter of law.

■ Whether a contractual modification was effected between the parties by the letters and work orders and checks exchanged is a matter for the trier of fact. We note that Indiana Rules of Civil Procedure, Trial Rule 50(A) states that

"[w]here all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict."

In determining whether there was sufficient evidence to support a jury verdict, this court will neither reweigh the evidence nor judge the credibility of witnesses. *Dubreuil v. Pinnick,* (1978) Ind.App., 383 N.E.2d 420, 421. Rather, we will view only the evidence most favorable to the verdict, together with all logical inferences flowing therefrom. *Id.* Here, the evidence most favorable to the verdict showed that the change in work had never been made part of the contract by proper modification. The jury could have so found from the evidence presented. The evidence was not insufficient to support the verdict. We find no error in the trial court's refusal to grant Plan-Tec's motion for judgment on the evidence.

*Issue Three*

■ Plan-Tec has not preserved any error as to the question of the court's giving of Terstep's instruction number 10B.

Plan-Tec argues that the trial court erred in giving Terstep's instruction number 10B insofar as the court thereby instructed the jury to determine whether there was a valid indemnity provision in the contract and to determine the relationships among the parties. Plan-Tec maintains that this is contradictory to its instruction number 3. However, Plan-Tec has waived review of this issue by raising different grounds on appeal than those asserted at trial.

■ Terstep's instruction number 10B presented the jury with certain possibilities concerning the relationships among the parties and the effect of the indemnity agreement upon those relationships. It read as follows:

"One of the questions at issue in this action is whether third-party defendant Terstep Company, Inc. was hired to do the work which it was doing at the time of plaintiff, Ivan Wiggins'[s] accident as a subcontractor to defendant The Blakley Corporation as additional work under the written contracts in question, or whether Terstep Company, Inc. had entered into a separate contract with someone other than The Blakley Corporation for the work it was performing.

I instruct you that if you find that Terstep Company, Inc. was doing the work in question as a modification of the original contract and that it was doing the work as a subcontractor of defendant The Blakley Corporation, then I instruct you that under the indemnification clause found in Section 5.16.1 of the Project Manual, defendant, Plan-Tec, Inc. is entitled to indemnity from The Blakley Corporation for any damages awarded against Plan-Tec, Inc., if plaintiff, Ivan Wiggins'[s] damages were caused in whole or in part by any negligent act or omission by The Blakley Corporation or Terstep Company, Inc. or anyone directly or indirectly employed by either of them, regardless of whether or not defendant Plan-Tec, Inc. may have also been negligent.

I further instruct you that if you find that the work in question was not being performed by Terstep Company, Inc. as a subcontractor of the Blakley Corporation and if you also find that Terstep Company, Inc. was doing the work as a contractor of the owner on directions from Plan-Tec, Inc., the owner's agent, and thereby Terstep Company, Inc. became a 'Contractor' as defined by the Project Manual, then Terstep Company, Inc. is required to indemnify Plan-Tec, Inc. for any damages awarded against Plan-Tec, Inc., if those damages were caused in whole or in part

by any negligent act or omission by Terstep Company, Inc. or anyone directly or indirectly employed by Terstep Company, Inc. regardless of whether or not Plan-Tec, Inc. was also negligent, provided, however, that you find a valid indemnity contract or agreement was a part of the work performed by Terstep Company, Inc.

I further instruct you that if you find that the work in question the plaintiff, Ivan Wiggins, was performing at the time of the accident was not being performed by Terstep Company, Inc. as a subcontractor of The Blakley Corporation and if you also find that Plan-Tec, Inc. was acting as a contractor and Terstep Company, Inc. was acting as a subcontractor of Plan-Tec, Inc. when the work in question was being performed then Terstep Company, Inc. is not required to indemnify Plan-Tec, Inc. for any damages awarded against Plan-Tec, Inc."

Record at 834–35. Plan-Tec objected to the giving of the instruction in the following words:

"Yes, Your Honor, at this time I would like to file a Motion for Continuance in this trial in order to allow the Defendant Plan-Tec to further consider it's objections to the remaining three parties['] instructions, and also to submit further instructions to the Court, a[t] least until tomorrow if not longer, Your Honor. Now, that is, if the Court is going to consider these filings being made at this hour by Terstep Company and by the other party, and I make that sincerely, Your Honor, and I think that we ought to have the opportunity, we weren't a part of whatever discussion went on yesterday about these matters, none of these things were served on us yesterday, only this morning, and I think that after having spent the entire day Friday working out the instructions, making objections at that time, having the Court rule on them, relying on that over the weekend, preparing our arguments to the Jury at this time, we can't be expected to change our whole position in this case at this late date when the Jury arguments are sup-

posed to begin about twelve minutes ago. With regard to the Jury Verdict Form, it has not been settled on yet, it is not necessary to change jury instructions or anything else to conform to the Jury Verdict Form when there isn't any Jury Verdict Form, there was a suggested one last week, it has been redone and resubmitted to the Court this morning, and Mr. Smith has submitted another form this morning, so there isn't any Jury Verdict Form which has been adopted by the Court, and that is getting the cart before the horse to say you have to amend the instructions to agree with the Verdict Form when there isn't one even prepared yet. If this instruction is going to introduce a new possibility, Your Honor, we have to consider whether there are other instructions which we would want to file to address this possible outcome and whether or not we want—there are objections which Mr. O'Connor and I discussed the Plaintiffs['] instructions over the weekend, there is one of them in there which I seriously believe is reversible error, but it was decided on by the Court, it was an objection that we didn't even raise at that time. There are other objections that I put on the record when I came over here yesterday morning before the rest of the parties arrived, I made my objections on the record, which might not have been made when we were with the Court on Friday, however I didn't bring them up until this morning, I thought they are on the record, and they will be there for that purpose, but I am not going to try to get the Court to change what it did before at this date, I don't think that it is fair to the other parties to do that, and I don't think they are being fair to us to expect us to meet these things at this time."

Record at 3420–23. Plan-Tec's objection is very clearly based upon the notion that Plan-Tec suffered unfair surprise because of the tender of Terstep's instruction number 10B. However, on appeal Plan-Tec argues that the instruction was contradictory to Plan-Tec's instruction number 3 which was also given, because Plan-Tec's instruc-

tion number 3 informed the jury that the court would advise them of the duties of the respective parties, whereas Terstep's instruction 10B allows the jury to determine the relationships of the respective parties and the application of the indemnity provisions thereto. It is well settled in Indiana that a party objecting to an instruction may not vary its grounds for objection on appeal. *Stanley v. Johnson,* (1979) Ind.App., 395 N.E.2d 863, 867; *Davis v. Schneider,* (1979) Ind.App., 395 N.E.2d 283, 289. It is readily apparent that Plan-Tec is attempting to assert new grounds on appeal. The objections raised on appeal by Plan-Tec were not before the trial court as objections to the giving of the instruction. Plan-Tec has thereby failed to preserve any error.

Plan-Tec also argues that the trial court erred in giving Terstep's instruction number 10B on the grounds that the interpretation and construction of the contract and the determination of the relationships among the parties are questions of law to be determined by the court. Again, Plan-Tec attempts to assert new objections on appeal. This we will not allow. Since Plan-Tec varied its grounds for objection to Terstep's instruction number 10B on appeal, Plan-Tec has failed to preserve any error.

*Issue Four*

The trial court did not err in denying Plan-Tec's motion for a continuance when it modified Plan-Tec's instruction number 4 and agreed to give Terstep's instruction number 10B.

After final instructions were argued, the trial court apprised the parties that it would give Plan-Tec's instruction number 4 as modified. Subsequently, on the date on which closing arguments were to be heard, Terstep objected to the giving of Plan-Tec's instruction number 4 as modified and tendered its instruction number 10B, which instruction was given over objection. Plan-Tec moved the court to continue the action so that it could properly prepare to argue against the tendered instruction. The trial court denied Plan-Tec's request for a continuance. Plan-Tec argues that it was unfairly surprised and should have been

granted the continuance. Appellees argue that the granting of a continuance is a matter within the discretion of the trial court and absent the court's abuse of discretion the action of the court will not be reversed on appeal. We are constrained to agree with the appellees.

█ The Indiana Rules of Civil Procedure, Trial Rule 53.4 states, in part, that "[u]pon motion, trial may be postponed or continued in the discretion of the court, and shall be allowed upon a showing of good cause established by affidavit or other evidence." While the granting or denial of a continuance are clearly matters within the discretion of the trial court, *Hyatte v. Lopez,* (1977) 174 Ind.App. 149, 152, 366 N.E.2d 676, 678, *trans. denied,* and thereby reviewable only for an abuse of that discretion, *Chambers v. Public Service Co. of Indiana, Inc.,* (1976) 265 Ind. 336, 343, 355 N.E.2d 781, 785–86, it is also well settled that such a motion should be granted when good cause is shown. *Maneikis v. State,* (1980) Ind.App., 407 N.E.2d 1178, 1180; *Hambey v. Hill,* (1971) 148 Ind.App. 662, 668, 269 N.E.2d 394, 398, *trans. denied.* If good cause is shown for the continuance, denial of the motion will be deemed to be an abuse of discretion.

█ In the instant case, Plan-Tec moved for a continuance after Terstep tendered its instruction number 10B, contending that it was unduly surprised in such a way that ordinary prudence could not have guarded against it within the meaning of Indiana Rules of Civil Procedure, Trial Rule 59(A)(2). Plan-Tec contends that the continuance was necessary to prepare final argument "based on this very important instruction" and "because [Plan-Tec] might have also tendered additional instructions or amended instructions had it known that the court would continue to entertain such tendered instructions without limit." Appellant's Brief at 78. We agree with appellee Terstep's position that Plan-Tec cannot now seriously contend that the substance of Terstep's tendered instruction number 10B came as a complete surprise to Plan-Tec. Whether a valid indemnity agreement ex-

isted and covered the work done by Terstep in changing the expansion joints and whether Plan-Tec acted as a contractor in assigning such work were both integral parts of the lawsuit and were, in fact, both discussed by the parties shortly before final argument. This is not sufficient to demonstrate surprise so as to give rise to good cause shown for the granting of a motion for continuance. Where the party alleging error in the denial of a motion for continuance has failed to show good cause for the continuance, there can be no abuse of discretion. Accordingly, the trial court did not abuse its discretion in denying Plan-Tec's motion for a continuance.

*Issue Five*

Plan-Tec has waived any alleged error in the court's giving of plaintiffs' instructions numbers 2 and 9.

■ Plan-Tec first argues that the trial court erred in giving plaintiffs' instruction number 2 because it conflicted with Plan-Tec's instruction number 3, which was given. As we previously noted, in appealing any alleged error in the giving of instructions, the objecting party on appeal is limited to its stated objection at trial. *Stanley; Davis.* At trial, Plan-Tec objected to the giving of plaintiffs' instruction number 2 as follows:

"The first objection is to the plaintiffs' tendered Instruction No. 2, which has to do with ambiguous contracts and the basis for the objection is that the plaintiff did not prepare the contract in question, particularly that part which the plaintiffs contend is ambiguous, that is the part relating to utility contractors found in Article X of the General Conditions of the contract, but rather according to the testimony of Tony Boschenko these parts of the contract were prepared by the architect firm, Shimer & Associates, which was an independent contractor at the time the contract was prepared. This instruction as tendered was modified to insert the word 'had' in the third line between Plan-Tec, Inc. and prepared, which we believe is also objectionable for

the reason that it then provides that the contract will be construed against Plan-Tec, Inc., even if it just had the contracts prepared by someone else and didn't prepare them itself, so we think the instruction is erroneous for the reason that it applies a rule of law concerning ambiguous contracts being construed strictly against the preparer when Plan-Tec, Inc. was not in fact the preparer of the contracts in this case."

Record at 3399–3400. On appeal, Plan-Tec argues that the instructions were contradictory and, therefore, Wigginses' instruction should not have been given since Plan-Tec's instruction number 3 was given. Plan-Tec's objection on appeal is not the same objection that it raised at trial. Plan-Tec has, therefore, waived any error in the giving of plaintiffs' instruction number 2.

Plan-Tec also argues that the trial court erred in giving plaintiffs' instruction number 2 because it is an incorrect statement of the law. However, again Plan-Tec failed to object to the giving of the instruction on that basis. As grounds on appeal may not be varied from those stated at trial, Plan-Tec has, thereby, waived any error in the giving of the instruction.

■ Plan-Tec finally argues that the trial court erred in giving Wigginses' instruction number 9 as it incorrectly states the law in Indiana. However, Plan-Tec also waived this argument. It is well settled that

"[w]hen error is predicated on the giving or refusing of any instruction, the instruction shall be set out verbatim in the argument section of the brief with the verbatim objections, if any, made thereto. Any error alleged in the motion to correct errors not treated as herein directed shall be deemed waived."

Indiana Rules of Civil Procedure, Appellate Rule 8.3(A)(7). *See Jacoby v. Sears, Roebuck & Co.,* (1970) 148 Ind.App. 110, 120–21, 264 N.E.2d 89, 95. Plan-Tec failed to set out both the instruction given and its objection thereto. Plan-Tec has waived any error thereby.

*Issue Six*

█ The trial court did not err in refusing to give Plan-Tec's tendered instruction number 9.

Plan-Tec's tendered instruction number 9 combined some of the plaintiffs' admissions with a general contributory negligence instruction as follows:

"The plaintiffs have admitted that:

1. Proper lifelines were available for the protection of workers using the scaffolding in question.

2. At the time the accident occurred, Ivan Wiggins was not wearing a safety belt.

3. At the time the accident occurred, a lifeline was hanging near where Ivan Wiggins was located on the scaffold.

4. It was not a proper safety practice to ride on the scaffold in question without a lifeline being attached to one's person.

5. The lifeline which was hanging near Ivan Wiggins was not attached to a permanent part of the building.

6. It was not a proper safety practice to secure the lifeline to anything other than a permanent part of the building.

7. Proper safety practice requires the lifelines be attached to the building or other permanent structure.

8. The principal purpose of a safety line is to prevent the wearer from falling to the ground in the event of an accident.

9. Ivan Wiggins'[s] injuries to his back and heels were sustained in part by hi[s] falling to the ground with the scaffold.

10. Neither Plan-Tec, nor its agents, had prior notice of the decision to assign Ivan Wiggins to the scaffolding on September 17, 1975.

If you find that the conduct of the plaintiff, Ivan Wiggins, as evidenced by the foregoing admissions constitutes a failure on the part of plaintiff, Ivan Wiggins, to exercise reasonable and ordinary care for his own safety, and that such failure proximately contributed to the cause of his accident and injuries, then

you should find the plaintiff, Ivan Wiggins, was guilty of contributory negligence and your verdict should be for the defendants."

Record at 803. Plan-Tec argues that its tendered instruction number 9 accurately states the law and should, therefore, have been given by the trial court. Wigginses argue that the selected admissions unduly emphasized certain facts and would have prejudiced the plaintiffs. They further contend that the substance of the refused instruction was covered by another instruction which was given. We agree with the Wigginses' contentions.

Plan-Tec correctly notes that when considering whether any error results from a refusal to give a tendered instruction, the court must determine (1) whether the tendered instruction correctly states the law, (2) whether there is evidence in the record to support the giving of the instruction, and (3) whether the substance of the tendered instruction is covered by any other instructions that are given. *Dahlberg v. Ogle,* (1978) 268 Ind. 30, 40, 373 N.E.2d 159, 164–65; *Duchane v. Johnson,* (1980) Ind.App., 400 N.E.2d 193, 195. While Plan-Tec admits that the court did give a contributory negligence instruction, Plan-Tec insists that since the additional material in its instruction was acceptable as it involved Wigginses' admissions, the trial court erred in failing to give its contributory negligence instruction. However, Wigginses note that an instruction which singles out or gives undue prominence to a particular fact or evidence is erroneous. *Chicago & Eastern Illinois Railroad Co. v. Alexander,* (1955) 126 Ind.App. 75, 79–80, 125 N.E.2d 171, 173, *trans. denied.* In *Chicago & Eastern Illinois Railroad,* the plaintiff was struck by a train while crossing a grade in his automobile. On appeal, the railroad argued, among other things, that the trial court erred in refusing to give its instruction number 20 which stated that "[i]f you find it to be a fact that it was broad day light [sic] at the time the collision occurred and that plaintiff did not see the train, then you have a right to take this fact into account in determining whether plaintiff looked

with reasonable care." *Id.* at 79, 125 N.E.2d at 173. The court noted that "[t]he fact of its being daylight when the collision occurred, standing alone, is of such meager probative value on the question of the appellee's conduct in looking for an approaching train that the instruction gives it undue emphasis and it was properly refused." *Id.* at 79–80, 125 N.E.2d at 173.

The ten admissions included by Plan-Tec in its tendered instruction number 9 were part of a larger group of requests for admissions that Plan-Tec submitted to all parties in the litigation. Not all these requests were admitted by the Wigginses. This court is cognizant of the fact that requests for admissions may often be self-serving and, thereby, rather less than likely to present fairly the question of contributory negligence to the jury when utilized as part of an instruction. In fact, the admissions in this case do tend to emphasize unduly certain aspects of the alleged contributory negligence of the plaintiff. For example, although Plan-Tec's instruction stresses that Ivan Wiggins was not wearing a safety belt at the time of the accident, the instruction does not note that testimony at trial revealed that there were no belts available. The instruction is self-serving in that respect and does emphasize unduly certain aspects of the contributory negligence question. The trial court did not err, thereby, in refusing to give the tendered instruction.

*Issue Seven*

The trial court erred in refusing to instruct the jury concerning Wiggins's past convictions.

At trial, evidence was introduced concerning Wiggins's convictions for burglary and car theft. At the close of trial Plan-Tec tendered an instruction dealing with such convictions, which the trial court refused. Plan-Tec argues that such refusal is error and requires reversal. While we agree it was error to refuse the tendered instruction, we cannot agree that such error requires reversal.

■ Plan-Tec correctly notes that convictions involving crimes of dishonesty or false statement and crimes of an infamous nature are admissible for impeaching a witness's credibility. *Ashton v. Anderson,* (1972) 258 Ind. 51, 62–63, 279 N.E.2d 210, 216–17; *Otto v. State,* (1980) Ind.App., 398 N.E.2d 716, 717, *trans. denied.* Both burglary, *Ashton,* and theft, *Geisleman v. State,* (1980) Ind., 410 N.E.2d 1293, 1296, are among those crimes for which prior convictions may be used to test credibility in subsequent actions. We also agree with Plan-Tec that the instruction accurately stated the law,[8] that there was evidence in the record to support it, and that the substance of the tendered instruction was not covered by other instructions. *Duchane.* The trial court clearly erred in refusing the instruction which met the test as set forth in *Duchane.* However, we also note that in order to constitute reversible error, there must exist both an erroneous ruling and prejudice to the complaining party. *Cunningham v. Cunningham,* (1982) Ind.App., 430 N.E.2d 809, 813. While Plan-Tec has demonstrated the first requirement, it has failed in its burden to demonstrate the second. If any party in the instant case stood to be prejudiced by the trial court's refusal to give a limiting instruction regarding Wiggins's prior convictions, it was Wiggins himself. Plan-Tec cannot seriously contend that it was prejudiced by the court's failure to so instruct. Absent prejudice, this court will not overturn an error of the trial court. The court's error in refusing to give Plan-Tec's tendered instruction number 5 is harmless.

8. Plan-Tec's tendered instruction number 5 read as follows:

"Evidence has been introduced in this action that plaintiff, Ivan Wiggins, has been convicted of the crimes of burglary and car theft. Such matters are allowed into evidence solely for the purpose of assisting you in evaluating the trustworthiness of the testimony given in this action by Ivan Wiggins, because they are considered to reflect on his honesty. You are to determine what is true in this action, and what is not fact, and you may consider evidence of such convictions in making your determination of what you believe and what you do not believe."
Record at 799.

*Issue Eight*

Plan-Tec has waived any error regarding Rago's testimony in contravention of Plan-Tec's motion in limine.

Prior to trial Plan-Tec filed a motion in limine in the following words:

"Defendant, Plan-Tec, Inc., moves the Court for an order in limine prohibiting the following:

1. Plaintiff's counsel asking any witness to identify the persons, firms or corporations who had overall responsibility for safety, for developing an overall safety plan, for conducting safety inspections, for enforcing contract specifications concerning safety, or for conducting hazard, risk, danger analyses, all concerning the construction job in question in this case.

2. Any of plaintiff's witnesses testifying concerning the matters set out in rhetorical paragraph 1 hereof.

3. Plaintiff's counsel asking any witness for an opinion concerning the matters set out in rhetorical paragraph 1 hereof.

4. Any of plaintiff's witnesses testifying as to his opinion concerning the matters set our [sic] in rhetorical paragraph 1 hereof.

5. Plaintiff's expert witnesses testifying, as George Rago did on page 13, question 53, of his deposition, that a construction safety program must begin in the pre-job planning stages, must begin at the top and be reflected down through the ladder of authority 'from the owners to the construction managers, the prime contractor to the general contractors, through the trades to the subcontractors,' and that this is 'the only way that construction safety pays on a job site,' or any other testimony or opinion which directly states or tends to establish that Plan-Tec, Inc. had any legal responsibility with regard to safety, on the construction job in question in this case.

Plan-Tec, Inc. further asks the Court that said order direct plaintiff's counsel to admonish his witnesses not to testify to any of the matters previously set out herein."

Record at 692–93. The motion was granted by the court. At trial, during the testimony of George Anthony Rago, the following discussion took place.

"Q 132 Now, what in the field of safety engineering, particularly in regard to construction safety, is the term 'Ladder of Authority', what does that mean?

A Well, the ladder of authority which is commonly referred to is, from a safety standpoint, the way the job is going to be set up, and that comes down through, as you said, the ladder, which comes from an owner of a project—

MR. BOURNE: Now, Your Honor, at this point, we are going to object, I think this is in—this testimony is progressing in clear violation of the Motion and Order in Limine.

MR. PARDIECK: We are not intending to refer to any individual on this particular job, Your Honor, I am asking him hypothetically about jobs, construction jobs generally.

THE COURT: Do you want to bring your question in that manner? Objection sustained.

Q 133 Mr. Rago, not with regard to this particular case or any particular party in this case, but speaking hypothetically about construction sites generally, can you tell us what a ladder of authority is in the field of safety engineering, strictly in relation to construction sites?

A As I started to say, it's a feeling, it's a knowledge of problems in the area of construction safety, that developes—

MR. BOURNE: Pardon me, Your Honor, I am going to object to this, the witness is not responding to the question that he was asked, what is the ladder of authority, and he is saying it's a feeling, and I don't think that is responsive to the question.

THE COURT: Well, I think that is more of a subject of cross examination than—

MR. BOURNE: All right, Your Honor, thank you.

THE COURT: So your objection is overruled there. Go ahead.

A Well, the authority is, the authority ladder is the ladder established in a project that comes down through management from the owner to the construction manager or the general contractor, right on through the prime contractors down to all the subcontractors, the venders [sic], and everybody else that is going to be involved in the project in that if safety is thought of and enforced at that level, it is going to be enforced throughout the job."

Record at 2102–04. Plan-Tec now argues that the trial court erred in limiting Plan-Tec's motion in limine to prohibiting only the identification of the specific party that was responsible for overall safety on the job. Plan-Tec, however, has failed to preserve the question on appeal.

■ We initially note that paragraph one of Plan-Tec's motion requests that Wiggins be prohibited from asking any witness to identify the persons, firms, or corporations with responsibility for job safety. Plan-Tec contends that the trial court erred in limiting its motion in limine to excluding merely the identity of specific parties. However, this is exactly what Plan-Tec requested. Plan-Tec cannot now contend that it was prejudiced by the court giving effect to the very words of its own motion.

■ Plan-Tec further argues that the court erred in allowing testimony in contravention of paragraph 5 of its motion. A review of the testimony, however, indicates that the error was Plan-Tec's, and not that of the trial court. Upon the first asking of the question which would draw the prohibited answer, counsel for Plan-Tec objected on the ground that the question and answer violated the motion and order in limine. That objection was sustained. The question was rephrased and asked again. Plan-Tec's counsel then objected that the answer was not responsive, whereupon witness Rago answered the question in full, thereby giving an answer in contravention of the motion and order. Plan-Tec now alleges that it was error for the trial court to allow this testimony because it "by clear implication identified Plan-Tec as the party responsible

for the safety on the project. . . ." Appellant's Brief at 66. However, as the transcript clearly shows, Plan-Tec neither objected prior to the giving of the completed answer nor moved to strike the prohibited response nor asked the court to admonish the jury concerning the answer. It is well settled that a party may not endure error at trial and then complain on appeal. *Enderle v. Sharman,* (1981) Ind.App., 422 N.E.2d 686, 691; *Apple v. Hall,* (1980) Ind.App., 412 N.E.2d 114, 117. Plan-Tec did not object on the ground that the second answer would violate the motion and order nor did it take corrective measures thereafter. Plan-Tec cannot now be heard to complain that the testimony violated the motion in limine.

[28] Plan-Tec also argues that the court should not have allowed Rago's testimony because it constituted an opinion on a matter for the decision of the court. However, Plan-Tec did not object on that ground at trial. A party is limited on appeal to objections raised at trial. *English Coal Co.,* 422 N.E.2d at 309. Plan-Tec has thereby waived any error.

*Issue Nine*

The trial court did not err in refusing to relieve Plan-Tec of Wiggins' motion in limine regarding social security benefits.

During Ivan Wiggins's direct testimony the following questioning took place:

"Q 305 Now Ivan, your medical, hospital, prescription drug bills, those shoes, all the appliances that you've had in the course of treatment was paid for by your Workmen's Comp Carrier, was it not?

A Yes, it was, when I get these resewed and everything and had a new cushion put in them, I have to pay for that.

Q 306 And in addition to that they paid you weekly benefits, did they not?

A Yes sir.

Q 307 And you received all the benefits that the law allows for that, have you not?

A Yes.

Q 308 And that now has been cut off and is at an end, is that correct?

A Yes, it has been cut off."

Record at 1854–55. Wigginses had filed a motion in limine, which was granted by the trial court, to prevent the defendants from informing the jury that Wiggins had received, and was at the time of trial receiving, social security benefits. Plan-Tec contends that it should have been relieved from the motion and order in limine and allowed to question Wiggins concerning social security benefits he had received and was receiving, because Plan-Tec contends that Wigginses' counsel "opened the door." Wigginses contend that absent an offer of proof by Plan-Tec, no allegation of error is preserved on appeal. Neither party is correct in its contentions.

█ It is well settled that offers of proof are only proper on direct examination. *State v. Quackenbush,* (1973) 158 Ind. App. 603, 609, 303 N.E.2d 830, 834. Plan-Tec's counsel requested relief from the motion in limine during the cross-examination of Wiggins. There was no need for Plan-Tec to make an offer of proof. As such, Wigginses' contention, that Plan-Tec waived its argument by failing to make an offer of proof concerning the social security payments, is without merit. However, Plan-Tec's argument is also of no moment.

█ Plan-Tec argues that Wigginses opened the door on direct so as to require that Plan-Tec be allowed to examine Wiggins concerning social security benefits. A cursory examination of the testimony itself is enough to dispel this notion. The testimony very clearly deals with workmen's compensation benefits, not social security benefits. "It is well-settled that the scope of cross-examination is limited to the subject matter covered in direct examination . . . ." *Walker v. State,* (1982) Ind., 442 N.E.2d 696; *Dean v. State,* (1980) Ind., 398 N.E.2d 1270, 1272. As no testimony on direct examination covered social security benefits, the court did not abuse its discretion in so limiting cross-examination. *Lovko v. Lovko,* (1978) Ind.App., 384 N.E.2d 166, 173, *trans. denied* (trial court has dis-

cretion in scope of cross-examination). The trial court did not err in refusing to relieve Plan-Tec of Wigginses' motion in limine.

*Issue Ten*

The trial court did not err in excluding portions of the deposition testimony of James Vest.

Plan-Tec contends that the trial court erred in excluding the deposition testimony of James Vest. The excluded portion of Vest's testimony indicated that Wiggins and Bratcher did not first go to the roof of the building to inspect the outrigging and counterweights prior to riding the scaffold, but rather, rode the scaffold to the top of the building to do their inspection. Vest's deposition indicated that Larry Wilcox, the foreman of Terstep, had told him how the man had ridden the scaffold to the top of the building without first inspecting it.[9] Plan-Tec argues that since Wilcox was a foreman and Vest a supervisor of operations and member of Terstep's board of directors, the statements contained in the deposition were admissions of a party and thus admissible. Wigginses argue that the statements were hearsay and, therefore, inadmissible. An examination of the relevant law leads us to conclude that Wigginses are correct.

█ We note initially that hearsay is "testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of the matters asserted therein, *and thus resting for its value upon the credibility of the out-of-court asserter."* *Patterson v. State,* (1975) 263 Ind. 55, 56–57, 324 N.E.2d 482, 484 (emphasis in original). In light of the facts in this case, we begin with the assumption that Vest's statement was hearsay, at least once and probably twice removed from his personal knowledge. The question then is whether this testimony, even though technically hearsay, is admissible under the so-called *Patterson* rule. It is not.

9. While testimony is conflicting, it appears that Wilcox also had no personal knowledge of the occurrence, but rather, was informed of it by another unidentified party.

*Patterson* involved the admission of the signed pretrial statements of two witnesses. On cross-examination, defense counsel sought to impeach one of the witnesses with excerpts from her prior written statement. The court then permitted the state to introduce the entire written statement over the defendant's hearsay objection. On direct examination the state then offered the prior written statement of the other witness for impeachment purposes. The defense objected on the ground that there was no basis for the state's impeachment of its own witness. The court admitted the prior written statement but did not instruct the jury that the prior statement could only be used for impeachment purposes and not as substantive evidence. Our supreme court upheld the admission of the statements as substantive evidence because both of the out-of-court asserters were on the stand at the time their out-of-court assertions were offered and neither denied giving the statements. "It was, therefore, not necessary for the truth of the out-of-court assertions to rest upon the credibility of persons not present and then subject to cross-examination concerning the statements." *Id.* at 58, 324 N.E.2d at 484.

Simply stated, the *Patterson* rule holds that "a prior statement of a witness is admissible, not only for purposes of impeachment, but also as *substantive evidence,* provided the out-of-court asserter is present at trial for cross-examination." *Smith v. State,* (1980) Ind.App., 400 N.E.2d 1137, 1141 (emphasis in the original). The definition is not entirely adequate, however. This court noted in *D.H. v. J.H.,* (1981) Ind.App., 418 N.E.2d 286, that the common thread among cases wherein the *Patterson* rule was relied upon was the fact that the out-of-court declarant had *in fact* testified *and* been subject to cross-examination. *D.H.,* 418 N.E.2d at 294–95. We also noted in *D.H.* the supreme court's recent attempts to limit the misuse and over-extension of the *Patterson* rule.

In *Samuels v. State,* (1978) 267 Ind. 676, 372 N.E.2d 1186, Justice Prentice noted that "[t]o the extent that [the rule] has, on some

occasions, been used to support the admission of out-of-court statements as a mere substitute for available in-court testimony, it has been misapplied." *Id.* at 679, 372 N.E.2d at 1187 (dictum). Justice DeBruler also noted that "use of prior statements of a trial witness by the proponent of the witness in lieu of available and direct testimony of such witness will not [sic] longer be sanctioned." *Stone v. State,* (1978) 268 Ind. 672, 678, 377 N.E.2d 1372, 1375. Most recently, Chief Justice Givan noted in *Lewis v. State,* (1982) Ind., 440 N.E.2d 1125 at 1130, that

> "the key question in determining whether or not an abuse of the *Patterson* rule has occurred is whether the State has submitted evidence as to the relevant factual events in the case by directly examining (and thereby making ... available for cross-examination) the witness-declarant about those facts. What we will not permit is for the State to put in substantive evidence of the witness-declarant's version of the facts solely through the admission of the witness' prior statement under the pretext of the *Patterson* rule. At some point the State must put the declarant of the prior statement on the witness stand and *elicit direct testimony as to the facts at issue.*"

*Id.* (Emphasis supplied.) Plan-Tec now urges upon this court precisely that over-extension of the rule which our supreme court has rejected. It is an invitation we must decline.

In the instant case, Plan-Tec attempted to introduce, by way of Vest's deposition testimony, Wilcox's statement that the injured men had not properly inspected the scaffold prior to use. This clearly falls within the ambit of hearsay. The statement was asserted to demonstrate the truth of the matters therein contained. As such, it relies upon the credibility of the out-of-court asserter. As we have noted, in such cases the out-of-court asserter must be available, must have actually been asked about the subject matter of the assertion, and be subject to cross-examination. While Wilcox was himself actually called by the

defendants and available for cross-examination, the content of his purported conversation with Vest was never alluded to while Wilcox was on the stand. As such, the facts in this case fall squarely within those cases which limit *Patterson*. Plan-Tec could not substitute the statements of Wilcox contained in Vest's deposition testimony as substantive evidence for that of Wilcox himself. There was, therefore, no error in the trial court's refusal to admit certain questions propounded of Vest and the answers given by him.

*Issue Eleven*

The trial court did not err in permitting Nicholas Hatfield to testify regarding Terstep's inability to negotiate the terms of the general conditions of the contract.

At trial, Nicholas Hatfield, as co-owner of Terstep, testified over objection that Terstep generally had little leeway in negotiating the terms contained in the general conditions of the contract. The question was objected to by Plan-Tec on the bases that it exceeded the scope of direct examination and was irrelevant as it tended to show that the contract entered into was unconscionable. Plan-Tec argues that since Terstep did not raise unconscionability as an affirmative defense or try it by implied consent, it constitutes a waiver of that issue. Terstep contends that even if the ruling admitting the evidence was erroneous, Plan-Tec has shown no prejudice and is, thereby, not entitled to a reversal. We agree with Terstep.

We initially note that the admission or exclusion of evidence is a matter within the discretion of the trial court. *Clouse v. Fielder*, (1982) Ind.App., 431 N.E.2d 148, 155; *Smith v. Crouse-Hinds Co.*, (1978) Ind.App., 373 N.E.2d 923, 926, *trans. denied* (1979). The court also has discretion in the scope of cross-examination. *Clouse; Lovko v. Lovko*, (1978) Ind.App., 384 N.E.2d 166, 173, *trans. denied*. The trial court will be reversed for an abuse of discretion in admitting evidence only upon a showing that the court's action is clearly erroneous and against the facts and circumstances before the court and reasonable inferences

to be drawn therefrom. *Rust v. Guinn*, (1981) Ind.App., 429 N.E.2d 299, 305, *trans. denied*. We do not find that the admission of such evidence amounts to an abuse of discretion where the evidence not only tends to imply unconscionability as Plan-Tec suggests, but is also relevant to other issues, such as the assigning of liability under the contract provisions.

We further note that even if the admission of such evidence was error, it would not give rise to reversible error. In order to demonstrate reversible error, the complaining party must show both an erroneous ruling and prejudice resulting therefrom. *Cunningham*. Plan-Tec baldly asserts that it was prejudiced by the admission of the testimony in question. However, a bald assertion of prejudice is insufficient to overcome the burden placed upon the complaining party to affirmatively show prejudice. This court will not presume prejudice. *Atwood v. Prairie Village, Inc.*, (1980) Ind. App., 401 N.E.2d 97, 100. Plan-Tec has demonstrated no prejudice from the admission of the testimony. There is no reversible error.

Because Plan-Tec has shown no reversible error as to any of the issues it raises on appeal, the verdict of the jury and the court's judgment thereon are affirmed in toto.

Affirmed.

ROBERTSON, P.J., and NEAL, J., concur.